(C. D. 1494)

THE WINKLER-KOCH ENGINEERING COMPANY v. UNITED STATES

United States Customs Court, Second Division

(Decided February 5, 1953)

*Philip Stein* (*Marjorie M. Shostak* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Dorothy C. Bennett* and *Harold L. Grossman*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; RAO, J., not participating

LAWRENCE, Judge: Certain imported merchandise described in the record as "Seamless hot rolled A. P. I. Casings" was classified by the collector of customs pursuant to the provision in paragraph 328 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 328) for "all other finished or unfinished iron or steel tubes not specially provided for,"

and duty was assessed thereon at the rate of 25 per centum ad valorem. The initials A. P. I. are an abbreviation for the words American Petroleum Institute.

Although it is claimed in the protest that the merchandise should be classified as "pipes" in said paragraph 328, and dutiable at the rate of three-fourths of 1 cent per pound, the claim mainly relied upon, invoked by an amendment to the protest, is that the merchandise should be classified as "structural shapes of iron or steel * * * machined * * * or otherwise advanced beyond hammering, rolling, or casting" in paragraph 312 of said act (19 U. S. C. § 1001, par. 312), as modified by the trade agreement between the United States and Belgium, 67 Treas. Dec. 470, T. D. 47600, effective May 1, 1935, and dutiable at 15 per centum ad valorem.

The competing provisions of the statutes are here set forth, the language pertinent to this case being emphasized.

PAR. 328. *Lap-welded, butt-welded, seamed, or jointed iron or steel* tubes, *pipes,* flues, and stays, not thinner than sixty-five one-thousandths of one inch, if not less than three-eighths of one inch in diameter, *three-fourths of 1 cent per pound*; if less than three-eighths and not less than one-fourth of one inch in diameter, 1¼ cents per pound; if less than one-fourth of one inch in diameter, 1¾ cents per pound: *Provided,* That no tubes, pipes, flues, or stays made of charcoal iron shall be subject to a less rate of duty than 1¼ cents per pound; cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty; welded cylindrical furnaces, tubes and flues made from plate metal, whether corrugated, ribbed, or otherwise reinforced against collapsing pressure, *and all other finished or unfinished iron or steel tubes not specially provided for, 25 per centum ad valorem*; flexible metal tubing or hose, whether covered with wire or other material, including any appliances or attachments affixed thereto, not specially provided for, and rigid iron or steel tubes or pipes prepared and lined or coated in any manner suitable for use as conduits for electrical conductors, 30 per centum ad valorem.

| Tariff Act of 1930 paragraph | Description of articles | Rates of duty |
|---|---|---|
| 312 [as modified] | Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with *all other structural shapes of iron or steel;* any of the foregoing *machined,* drilled, punched, assembled, fitted, fabricated for use, *or otherwise advanced* beyond hammering, rolling, or casting. | 15% ad valorem. |

At the trial, the record in the case of *Winkler-Koch Engineering Co.* v. *United States,* 16 Cust. Ct. 42, C. D. 982, relating to merchandise which the parties agreed was similar in all material respects to

the merchandise here in controversy, was incorporated and made a part of the record in this case. The issue in that case was whether the merchandise should be classified as "pipes" as claimed by plaintiff, or as "steel tubes not specially provided for" as classified by the collector of customs. Upon the record before us in that case, we held, in the absence of competent commercial proof to the contrary, that a casing is a form of pipe and a pipe is a tube within the common meaning of the terms as ordinarily understood, and sustained the collector's classification.

In its brief, plaintiff sets forth the issues in the following terms:

1. That the merchandise at bar is not included within the term "tubes," in the tariff sense, or as that term was commonly or commercially known and understood throughout the United States at and prior to the passage of the Tariff Act of 1930; that, therefore, the merchandise is not properly dutiable under Paragraph 328 under the provision for "all other * * * iron or steel *tubes*, not specially provided for" in which, plaintiff contends, Congress never included nor intended to include either "pipes" or "casings."

2. That the merchandise at bar consists of oil well "casings"; that "*casings*" *are in fact structural shapes*, being *specially designed, constructed, and always used as such*; that under the rule of relative specificity and other rules of construction applicable to tariff laws, hereinbelow discussed, the provision for "all other structural shapes of iron or steel" in Paragraph 312, *supra*, *being a designation by use*, is in any event more specific, and *takes precedence over the eo nomine or descriptive designation* for "all other * * * iron or steel *tubes*, not specially provided for" in Paragraph 328, *supra*. Consequently, plaintiff maintains herein that the merchandise at bar is properly classifiable under the specific provision for "structural shapes" in Paragraph 312, *supra*, and dutiable thereunder at the rate of 15% ad valorem, by virtue of the aforesaid Belgian Trade Agreement, as claimed in plaintiff's protest herein as amended. [Italics quoted.]

Plaintiff makes the alternative and secondary claim, however, that the merchandise should be classified as "pipes" pursuant to said paragraph 328. All other claims in the protest are abandoned.

The following exhibits were introduced by plaintiff:

Collective exhibit 1. Requisition sheet, dated December 28, 1948, together with copies of purchase orders.

Exhibit 2. National Tube Co. publication "Oil Country Tubular Products."

Exhibit 3. Youngstown Sheet & Tube Co. publication entitled "Oil Country Tubular Goods," containing reprint of A. P. I. Code 5–C–1 of Recommended Field Practice on Care and Use of Oil Country Tubular Goods, May 1938 (on pages H–2 to H–9).

Exhibit 4 for identification. "Petroleum Production" by Wilbur F. Cloud, University of Oklahoma Press, 1937.

Exhibit 5 for identification. "Prospecting for Oil and Gas" by L. S. Panyity, 1920.

Collective illustrative exhibit 6. American Petroleum Institute Bulletins:

A. P. I. RP 5C1, 2d Edition, Sept. 1948, entitled "API Recommended Practice for Care and Use of Casing, Drill Pipe and Tubing."

A.P. I. Bull. 5C2, 4th Edition, August 1948, entitled "API Bulletin on Performance Properties of Casing and Tubing."

Exhibits in the incorporated case (protest 903322–G), also introduced by plaintiff:

Illustrative exhibit 1. A section of 7″ O. D. casing stock, illustrative of the casing at bar.

Exhibit 2. Page from handbook issued by Spang Chalfant, Inc., Pittsburgh, Pa.

Illustrative exhibit 3. A sample of lap-welded pipe 4″ in diameter.
Illustrative exhibit 4. A sample of butt-welded pipe 2″ in diameter.
Illustrative exhibit 5. A sample of seamless pipe 2″ in diameter.

All of the evidence, both oral and documentary, which was introduced upon the merits of the case was presented by the plaintiff, consequently it stands uncontradicted, unrebutted, and unimpeached.

The record discloses that the merchandise in controversy consists of seamless, hot-rolled, cylindrical casings, varying in length from 25 to 32 feet, with an outside diameter of 7 inches, weighing 24 pounds to the foot, screwed and socketed, made in accordance with A. P. I. standards, and generally used in the oil industry, other uses being incidental.

We shall consider first the testimony taken in the present case and later analyze the evidence in the incorporated case.

C. A. McNamara testified that for 30 years he has been superintendent of the stocks and materials at the Sinclair Oil and Gas Co. at Tulsa, Okla., being responsible for all materials in its warehouses and distributing them to wells that are being drilled. He also makes requisitions for material that is to be purchased. When asked what the term "A. P. I. 7 inch o. d. casing" means, he replied: "It is casing, various lengths, 18 to 25 feet lengths, more or less, made to American Petroleum Institute standard. 7 inch o. d. means the outside diameter of the casing. 24 pounds, as mentioned in this case, means it weighs 24 pounds to the foot." The specifications also mentioned— "the number of threads per inch, whether a V thread or a round thread, the length of the collar on the casing and the threads corresponding with the opposite end of the pipe, of the casing." The specifications also described the ingredients and thicknesses of the walls. If a casing is stamped A. P. I., "it is the same the world over."

The witness then described the use of the commodity, explaining that in constructing an oil well, the casing is run to protect the hole that has been drilled to prevent it from caving in. After that is done, a string of tubing is run inside the casing through which the oil comes to the surface. This testimony was based upon the witness' experience of from 20 to 25 years. He further testified that this

merchandise is requisitioned as "Seamless, A. P. I. seamless casing," never as tubes; that he never asked for tubes when he wanted casings, nor would he ask for casings if he wanted tubes, adding—"There is no similarity between tubes and casing that I know of." He testified that casings such as those in controversy had also been used in the same manner in water wells, although apparently to a limited extent, their predominant use being in the construction of oil wells. It appears that the casings are fitted with threaded ends in order that they. may be screwed together and lowered into the drilled holes which may be anywhere from 2,000 to 10,000 feet deep.

It is clear from the testimony of this witness that in the oil-well industry there is a definite distinction between tubing and casing, tubing being used as the means of conveying oil from subterranean sources to the surface of the earth while the casing is used as a structural member which serves the dual purpose of protecting the tubing which is run through it and also to prevent the hole which has been drilled from caving in. It is also not disputed that the casings are made in accordance with A. P. I. standards which are universally recognized to meet the requirements of the oil industry.

On cross-examination, the witness was asked if there are "cylindrical steel tubings that are 7 inch, 5 inch and 8 inch o. d., too," to which he replied: "Not tubes."

X Q. There is no such tubing?—A. Not that size that I ever heard of, to my recollection.

X Q. In what sizes are tubings, to the best of your recollection, constructed?— A. 2⅜ o. d., 2⅞ o. d., and there will be a 3½ inch o. d. and a 4½ inch o. d., but they are not generally used.

When asked if the casings in controversy were designed to sustain heavy weights, his answer was "Yes, sir."

I know of a bridge that was built with that purpose [of sustaining weights] that we built just a year ago. We used casing as a support for that bridge.

     *     *     *     *     *     *     *

X Q. Are these casings designed to carry a maximum load with a minimum amount of material?—A. Yes, sir.

The second witness on behalf of the plaintiff was F. F. Wright, a petroleum engineer with the degree of bachelor of science from the University of Oklahoma, a registered professional engineer in the State of Oklahoma, and a member of the National Society of Professional Engineers. Prior to becoming an engineer, he had been .employed in oil-field work in Kansas, Oklahoma, and Texas, which, he stated, are the major oil centers in the United States.

The third witness, Lloyd Holsapple, testified that he was division petroleum engineer for the Sinclair Oil and Gas Co.; had studied civil engineering at the. University of Colorado; was a member of the

American Institute of Mining Engineers; and had pursued his profession in the oil fields of Wyoming, Oklahoma, Texas, Louisiana, Mississippi, and New Mexico, which, he said, constitute the largest proportion of the oil-well industry in the United States.

The testimony of Wright and Holsapple was in substance like that of the witness, McNamara.

In the incorporated case, we have the testimony of C. C. Chapin who was secretary of the plaintiff corporation with which he had been identified since April 1929 and was purchasing agent from 1930 to 1937; that the plaintiff's business is the production of oil and the construction of oil refineries; that he ordered the imported merchandise in the incorporated case, supervised delivery, and checked it against the order; that he was thoroughly familiar with the use of such merchandise which was in connection with drilling for oil; that as the oil drilling progresses, one length of casing after another is placed in the drilled hole, the ends being screwed together, and so-called tubing in the form of small pipe, 2 or 3 inches in diameter, was run inside the casing to the bottom thereof through which the oil is brought to the surface.

C. A. Dunlop, the second witness for the plaintiff in the incorporated case, testified that he was an engineer with the Humble Oil & Refining Co. since 1924, the nature of his work including structural engineering, building design, and drafting; that he received a certificate of engineering from the University of Liverpool, England; that he was familiar with the merchandise in controversy, having been responsible for the design and construction of casing used in the oil wells of his company; was a member of the A. P. I. engineering subcommittee; had written articles on casing in which he discussed the trends and developments in A. P. I. pipe standards and the changes made in grade-C casing; that at the time of the hearing, he was supervisory engineer with the Humble company and was responsible for the selection, investigation, and design of oil-field materials, and was familiar with all types of tubular products used in the production branch of the oil industry.

He further testified that casings were never known or referred to as "tubes" in the oil trade, and that articles like the imported merchandise in outside diameter from 7 inches to 20 inches, weighing from 20 to 70 pounds per foot, were uniformly, definitely, and generally designated as oil-well casings, and are never known as "tubes"; that casings are made from specifications especially designed for use in the oil industry.

Ernest Cockrell, Jr., the third witness who testified for the plaintiff in the incorporated case, was a graduate of the University of Texas with the degrees of bachelor of science and master of science in petroleum production and engineering; he was familiar with the oil-production industry in the Gulf Coast area of Texas and Louisiana, Texas

being the largest producer in the country; that he had used casings in oil fields throughout the territory mentioned and had also bought and sold casings; that casings from 7 to 20 inches outside diameter and weighing from 20 to 70 pounds per foot are bought and sold in the oil-well industry as "casings"; that casings are made according to A. P. I. specifications to which they always conform; and that he had never in his experience heard of casings referred to as "tubes."

Without devoting more space to a detailed analysis of the testimony of the six witnesses introduced by plaintiff, which was not refuted in any way by the defendant, a thorough examination of the entire record leads to these conclusions:

(1) The merchandise consists of steel tubular goods which are known definitely throughout the principal oil fields of the United States as casings, and not as tubes.

(2) Said merchandise was made in strict accordance with specifications of the A. P. I. (American Petroleum Institute) so that whether made by one steel company or another, and regardless by whom it is ordered, the identical product would always be delivered upon an order for casings.

(3) The uncontradicted testimony introduced by plaintiff, reinforced by the recognized A. P. I. specifications and standards, as well as by authoritative text books and publications on the subject (see exhibits 2, 3, and 6), establishes plaintiff's contention that casings are not known in the oil trade as tubes or tubing but are clearly differentiated (a) in size, casings having a substantially greater diameter than tubes; (b) in weight; and (c) in use.

(4) With respect to use, casings may be run to great depths and serve a dual purpose (a) as a support to the wall of the hole that has been drilled and (b) as a protective medium for the tubing which is run inside the casing by means of which the oil is brought from subterranean sources to the surface. To perform these functions, the casings are made according to the specifications of the A. P. I. to withstand not only great hydrostatic pressure from the outside which might cause the casings to collapse, but also pressure from the inside, as well as vertical pressure and tension.

(5) That casings as a rule become permanent fixtures in the construction of a well since they are cemented in, while tubing may be withdrawn from time to time for use in other wells.

We held in the incorporated case that, in the absence of competent and commercial proof to the contrary, a casing is a form of pipe and a pipe is a tube within the common meaning of the terms as ordinarily understood. However, as will be pointed out *infra*, this question becomes academic here if such casings are, in fact, structural shapes of steel within the meaning of paragraph 312, *supra*. Upon this phase of the case, we are of the opinion, for the reasons which follow, that said casings are, in fact, structural shapes in the tariff sense.

Able and elaborate briefs have been filed by counsel for the parties, and it is evident that studious care and research have been devoted to the controversial points in issue.

Counsel have cited a great many authorities in addition to those which will be referred to below, but we find it unnecessary to give them special treatment in this opinion.

One of the earliest cases to which our attention has been invited where the court had occasion to interpret the meaning of the words "structural shapes" is *Birtwell* v. *Saltonstall*, 39 Fed. 383. The merchandise before the court in that case consisted of imported ironwork for the foundation or frame of the floor in the third story of the new courthouse in Boston. Each piece of iron was manufactured, fitted, punched, and shaped for its special place in the floor frame. The collector of customs classified the importation pursuant to the provisions of schedule C of the Tariff Act of March 3, 1883, reading as follows:

Iron or steel beams, girders, joists, angles, channels, car-truck channels, TT, columns, and posts, or parts or sections of columns and posts, deck and bulb beams, and building forms, together with all other structural shapes of iron or steel, * * *.

It was the contention of the importer that the above-quoted paragraph "refers to such described forms and shapes of iron in their ordinary completed condition as such forms and shapes, and does not refer to or include such described forms and shapes after they have been advanced, or taken for a special, particular use, and manufactured into a new product."

In the course of its opinion the court observed—"It must be always borne in mind that what was imported in this instance was not the beams, girders, and angles as known to commerce, nor a structural form, commercially speaking, but a new article of manufacture. The fact that this floor frame may have been composed of beams and other articles specifically enumerated in the same clause of the statute, or that when the frame was taken to pieces the beams might have been sold as beams, or have become, in a commercial sense, merchantable beams * * * does not, in my opinion, change the classification which should be made."

Further, in its opinion the court remarked—

I had some doubt in my own mind, at first, as to what might properly be included under the term "structural shapes of iron," as used in the clause relied upon by the collector; but I am satisfied, from the specific enumeration which precedes, and from the evidence of those engaged in this branch of business, that these words were not intended by congress, and do not, in a commercial sense, cover the importation in controversy in this case.

The court also said—

* * * It appears from the evidence that, speaking in a broad commercial sense, the term "merchantable iron" is limited to rounds, squares, and flats; that any-

thing else, such as beams, girders, angles, etc., having any special shape, and *intended to be used in the form of a structure, is a structural shape.* In this sense this floor foundation may be said to be manufactured of structural shapes. [Emphasis added.]

It was there held that the merchandise should be classified as manufactures not specially enumerated or provided for composed wholly or in part of iron whether partly or wholly manufactured.

An early case in our appellate jurisdiction upon this subject is *Simon, Buhler & Baumann (Inc.)* v. *United States,* 8 Ct. Cust. Appls. 273, T. D. 37537 (1918), relating to the proper tariff classification of parts of a brewery mash filter. The collector of customs had classified the merchandise as articles composed in chief value of metal. The importer claimed that certain of the parts should be classified as "structural shapes" within the meaning of paragraph 104 of the Tariff Act of 1913, which corresponds in material respects with paragraph 312 of the act of 1930. It was asserted by the United States, defendant in that case, that the articles were not dutiable as structural shapes because none of them was *ejusdem generis* with the articles specifically enumerated in paragraph 104 and, furthermore, that the particular parts were not intended to be used in the construction of buildings or ships. In its opinion, the appellate court stated—"We can not agree with either contention of the Government" pointing out that there was nothing "in the paragraph or the act which would warrant the conclusion that Congress intended to confine the materials, therein provided for, to such as are used for buildings, ships, and similar erections. Indeed, the fact that the paragraph provides for many articles which may be and are used in the construction not only of ships and buildings, but also in the erecting of *such well-recognized structures as bridges, wireless towers, trestles, water towers, derricks, dams, canal locks, and filtration plants,* coupled with the fact that it enumerates car-truck channels, a class of materials not designed for use in ships or buildings, convinces us that Congress had in mind more than two kinds of structures when the provision was passed." [Emphasis added.]

Further in its opinion, the court observed—

* * * that the expression "structural shapes" does import to people in general a capacity to sustain heavy weights or to resist great tension or both, and the things denominated in paragraph 104 convince us that such were the "structural shapes" which Congress intended to subject to the duty therein prescribed.

The filter which is to be made up in part of the materials in controversy is admittedly "a large and ponderous affair" and for its construction it requires frames, plates, centerpieces, heads, posts, channels, and grates of iron or steel, that is to say, materials of great strength capable of sustaining very considerable weights and tensions. A filter of that size made up of such constituents is, in our opinion, a structure as that word is commonly understood and the channels and grates of steel especially formed and designed for use in its construction are "structural shapes" within the meaning of paragraph 104.

It was accordingly held that the steel bars and grates involved in that case were "structural shapes."

It is clear from the foregoing opinion that the court was disposed to give to the term "structural shapes" a liberal rather than a narrow interpretation. This is made evident when 9 years later our appellate court in *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, was concerned with the dutiable classification of certain steel sheet piling which had been classified by the collector of customs as steel, not specially provided for, but which, it was claimed by the importer, should have been classified for duty as structural shapes, pursuant to the terms of paragraph 312 of the Tariff Act of 1922 which corresponds, so far as pertinent here, to paragraph 312 of the Tariff Act of 1930.

Paragraph 4 of the syllabus in that case reads as follows:

Steel sheet piling, used to form *cofferdams*, and also for making *foundations and retaining walls for buildings, bridges, dams, tunnels, levees, docks, breakwaters, etc.*—sometimes filled with concrete and sometimes not—sometimes removed to be used again and sometimes left in place—is not dutiable under paragraph 304, Tariff Act of 1922, as "sheets and plates and steel not specially provided for," because it is completely manufactured, but is dutiable under paragraph 312, as "structural shapes of iron or steel" not advanced. Corner sections, made by cutting the sections in two longitudinally and bolting the pieces together with angle iron, are such structural shapes, advanced, under the same paragraph. [Italics supplied.]

In the course of its opinion, the court referred with apparent approval to the earlier decisions in *Birtwell* v. *Saltonstall*, and *Simon, Buhler & Baumann (Inc.)* v. *United States, supra.* After quoting from its opinion in the *Simon, Buhler & Baumann (Inc.)* case, which arose when paragraph 104 of the Tariff Act of 1913 was in effect, the court stated—

The reasoning thus used is equally applicable to said paragraph 312, which contains practically identical language with said paragraph 104, in so far as the *eo nomine* designation of articles therein is concerned. The reenactment of this paragraph in the Tariff Act of 1922, unchanged, under the familiar rule, is indicative that the Congress knew of and concurred in the interpretation thus placed upon this language.

The court then proceeded with the statement that—

The interpretation thus put upon the term "structural shape" is in harmony with the common and ordinary meaning of the term. Webster's New International Dictionary (1925) thus defines it:

Structural shape. Engin. & arch., the shape of a member especially adapted to structural purposes, esp. in giving the greatest strength with the least material. Hence, colloq., any steel or iron member of such shape, as channel irons, I beams, T beams, etc., or, sometimes, a column, girder, etc., built up with such members.

A structure is thus defined by the same authority:

Structure. 3. Something constructed or built, as a building, a dam, a bridge; esp., a building of some size; an edifice.

It was the opinion of the court that—

The sheet piling in the case at bar plainly comes within the definition first above given. It is so made as to combine the greatest strength with the least weight and is exclusively used in erecting structures. While much of it is used under ground, lexicographers agree that a structure is not confined to that part of a building which appears above the ground. It is argued that the use of such piling being temporary, it is not a true structural material. Without attempting to foreclose discussion on this point, it is sufficient to suggest that the testimony shows that at least one-half of this piling is permanently installed in structures, where it forms a very essential and necessary part. If a thing is in fact a structural shape, the fact that it may at times be used only in temporary construction does not remove it from that classification.

The language above quoted fits the present case with singular precision. Adapting the language of the court to the facts in the present case, the evidence clearly shows that casings are made "to combine the greatest strength with the least weight," and are used practically exclusively "in erecting structures"; they are used under ground and are, with few exceptions which are unimportant, "permanently installed in structures."

Expert engineers of many years' experience have testified that in their opinion casings are structural shapes, and we are clearly of the opinion that if sheet piling which is used in the construction of bridges, dams, tunnels, levees, docks, breakwaters, and so forth, properly belongs in the class of structural shapes, it logically follows that casings which are used primarily in the construction of oil wells are likewise structural shapes. The fact of their use in isolated instances in the construction of sulphur wells, water wells, bridges, and cranes is added proof of their quality, design, and character which constitute them as belonging in the category of structural shapes.

Being of the opinion that the casings in controversy are in fact and in law "structural shapes," it is a question of no particular importance here whether or not they may also be "pipes" or "tubes." It is obvious that the enumeration of structural shapes in paragraph 312 is a use provision which the courts have held, in the absence of compelling reasons to the contrary, prevails over an *eo nomine* or a descriptive provision.

Referring to the doctrine of "use," our appellate court in *United States* v. *Snow's United States Sample Express Co.*, 8 Ct. Cust. Appls. 351, T. D. 37611, stated—

The rule is so well settled that where Congress has provided for an article eo nomine in one paragraph of a tariff act, and in another paragraph of the same act employs language comprehensive of the other designation, and rates it for duty according to *use* or when used for a certain purpose, that such is a strong, though we do not here say always a conclusive, evidence of an intention upon the part of Congress to make that use controlling, and states what may be deemed an exception to the eo nomine provision to be read in connection therewith. The rule was early employed by the Supreme Court in Maillard *v.* Lawrence (16 How.,

57 U. S., 251, 261). It found its full expression in *Magone v. Heller* (150 U. S., 70, 73.) * * * [Italics quoted.]

Note also *Carter & Son* v. *United States*, 6 Ct. Cust. Appls. 253, T. D. 35475, cited with approval in the *Snow's* case, *supra*. That doctrine has its appropriate application here.

Based upon the record before us, establishing as it does the designation and character of the merchandise, and the uses for which it was designed and to which it was put (*United States* v. *Julius Blum & Co., Inc.*, 26 C. C. P. A. (Customs) 168, C. A. D. 12), we hold the involved merchandise to be structural shapes within the meaning of paragraph 312, as modified, *supra*, and subject to duty at the rate of 15 per centum ad valorem, as alleged by plaintiff. That claim in the protest is therefore sustained. All other claims are overruled.

Judgment will issue accordingly.