(C.D. 2368)

C. TENNANT SONS & CO. OF NEW YORK *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 31, 1962)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* and *David O. Elliott* of counsel) for the plaintiff.

*Joseph D. Guilfoyle,* Acting Assistant Attorney General (*Richard E. FitzGibbon* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation described on the invoice as "SEAMLESS RECTANGULAR HOLLOW SECTIONS" was classified by the collector of customs as "Finished or unfinished iron or steel tubes nspf: other," in paragraph 328 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 328), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed thereon at the rate of 10½ per centum ad valorem.

Plaintiff claims that said merchandise should be classified in paragraph 312 of said act (19 U.S.C. § 1001, par. 312), as modified by the Torquay protocol to said general agreement, 86 Treas. Dec.

121, T.D. 52739, as structural shapes, not assembled, manufactured, or advanced beyond hammering, rolling, or casting, and dutiable at one-tenth of 1 cent per pound, or as structural shapes, advanced beyond hammering, rolling, or casting, and dutiable at 7½ per centum ad valorem.

The pertinent text of the statutes is here set forth.

Paragraph 328 of the Tariff Act of 1930, as modified by the sixth protocol, *supra:*

Finished or unfinished iron or steel tubes not specially provided for:
    If suitable for use in the manufacture of ball or roller bearings_____ * * *
    Other_____ 10½% ad val.

Paragraph 312 of said act, as modified by the Torquay protocol, *supra:*

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:
    Not assembled, manufactured or advanced beyond hammering, rolling, or casting_____ 0.1¢ per lb.
    Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting_____ 7½% ad val.

Plaintiff contends primarily that the articles in controversy are not tubes within the meaning of said paragraph 328. Alternatively, it is claimed that, even admitting, *arguendo*, that said articles are tubes within the meaning of said paragraph, they are also "structural shapes" of the kind provided for in paragraph 312 and that the latter classification is a more specific description of the merchandise. For reasons that will appear, *infra*, the latter claim will be considered first.

At the original trial, two witnesses were called to testify, both of whom appeared on behalf of the plaintiff.

Plaintiff's first witness, Ernest McMinn, stated that he was presently associated with the firm of Tubewrights, Ltd., London, England, a wholly owned subsidiary of Stewarts & Lloyds, the manufacturer and shipper of the subject merchandise. He had been with Stewarts & Lloyds for 39 years and, as technical director of Tubewrights, had control of all development work concerning the use of hollow sections and their fabrication. He was well trained and educated in the engineering profession and, during the early years of his association with Stewarts & Lloyds, he was engaged in designing steel tubes for use as pressure vessels to convey gases, fluids, and liquids. These were round hollow sections. Those applications led McMinn into the consideration and development of steel hollow sections for structural uses. The success of this venture led to the production of rectangular hollow sections with the result that, in late 1951, the 4-by-4 section was produced. This is illustrated by exhibit 1.

Exhibits 1, 2, 3, and 4 illustrate all of the rectangular sections included in the importation, except as to length. McMinn, who had observed the process of manufacture many times, testified that all of the sections represented by the four exhibits were manufactured by the same process, as follows:

Our process on the seamless range is—of rectangular hollow sections is essentially a casting and rolling process. It starts off by the steel being poured into ingot molds, and after the molds are stripped we are faced with a round ingot which is then heated and taken to a pre-piercing machine. This pre-piercing machine in essential is a cast-iron cylinder with a punch operated by a hydraulic ram. The ingot is inserted in the cast-iron cylinder and the ram pushes the punch up the center of the ingot but not right through. It leaves in effect a cap at the top. And the ingot now is termed a bottle.

This bottle now is taken from this pre-piercing unit and put into a rotary piercing unit where the hole is driven right up through the top of the ingot. The advantage of this is that defects in the original casting and conglomerations that do occur in casting methods are driven to one end of the ingot. So that we have the impurities located at one end of the ingot.

That ingot is then taken—it is now in effect a thick-walled hollow, and it is now taken to a pilger mill which in essence is two rolls which rotate and expand the metal from the thick hollow down over a mandril bar to form a thin-walled circular structural section. At that position the unsound material which occurs in every rolling process of this nature is parted from the ends by a hot saw, and a round, circular section is left. That hollow section is now taken and reheated and passed to an eight-stand sizing mill where the first four stands size the outside diameter of the hollow to the required diameter to give the periphery required for the rectangular section that's being rolled.

The next four rolls change the circular shape from a circle to a square or an oblong, as required.

Now the rectangular hollow section passes from the mill onto a cooling rack where after it has cooled down the unsound metal, again which occurs in the entry and exit of the roll to the sizing mill, are removed and we are left with a random length of the mill which is sold to the trade * * *.

McMinn testified concerning numerous tests, both practical and theoretical, to demonstrate that the sections in controversy were capable of maintaining the true characteristics and properties applicable to any structural section. To quote the witness, "In the introduction of new sections of this type it was plain to us that we had to prove that these section modulars, moments of inertia, radius of gyration were applicable to them from a theoretical point of view. And once we had got that we then proved the theory of these properties by practical test."

To confirm the load-bearing capacities under various loading conditions, practical tests were made for strength under compression, bending, and a combination of both. Compression tests made in comparison with an I-section demonstrated that the square rectangular sections could carry the same given load, but with less steel, for example, "* * * by the use of the square section as a column weight reductions for the same loading conditions * * * 25 to 30 percent were quite easily obtainable." The witness also gave an example of the load-bearing properties of exhibits 1 and 2 as cantilevers, in comparison to I-beams, noting that the rectangular hollow shape was more effi-

cient, due to its resistance to twisting (torque). Tests were conducted by the witness to determine the loading capacity of the rectangular hollow sections as beams by placing spans of the rectangular hollow sections over supports and loading them at two points. These tests, it was stated, demonstrated that normal loads could be applied to these sections in the manner that structural engineers apply when calculating strength properties.

In short, McMinn, a highly trained professional engineer, was of the opinion, as a result of practical and theoretical tests, that the sections represented by exhibits 1 to 4 were structural shapes. He defined a structural shape as "a shape that can withstand loading conditions of various forms or combinations and with the minimum amount of material." In other words, the exhibits possess the properties, characteristics, qualities, and other attributes which combine to identify a structural shape.

The witness stated that the rectangular sections in controversy had been used in four-story school buildings in their beam and column construction; that the only reason they were not used in buildings of from 15 to 30 stories is a lack of size of the sections needed to deal with such loading conditions. He also stated that the advantages of the rectangular sections over the circular sections result from the fact that the rectangular sections, having flat sides, are easier to join. Consequently, it is much more economical to use the rectangular shapes in preference to round sections.

Plaintiff's second witness, Gavin Stewart, another highly educated engineer and the managing director of Tubewrights, Ltd., defined a structural shape as "a shape which gives the best load bearing characteristics for the minimum weight of steel," and that exhibits 1 to 4 represent structural shapes.

As managing director, Stewart was responsible for the administration of his company and the development of the sales of their "ordinary" tubular products of all kinds, naming such products as were used for "water and gas mains, oil country goods of casting and line pipe, boiler tubes, and the ordinary merchant pipe."

Later, his firm began to explore and develop the use of tubes for structural purposes and, in this pursuit, he followed the experiments described by McMinn, which finally resulted in the production and sale of shapes represented by exhibits 1, 2, 3, and 4. With respect to production, Stewart testified "Currently we are producing about 10,000 tons a year of shapes similar to and including 1, 2, 3, and 4. We have recently put down more and more specialized plants which will bring the production up to about 50,000 tons a year."

With regard to use, Stewart stated that the shapes in controversy were employed in all forms of building structures; also on "a wide

range of towers, materials handling equipment, and a lot in coal mines."

During the progress of the trial, plaintiff's witnesses McMinn and Stewart gave testimony, based upon certain advertising matter and promotional material they had read, that rectangular steel hollow sections of the class or kind represented by exhibits 1 through 4 had been manufactured and used in the United States for structural purposes for several years.

After the case had been submitted, the court, *sua sponte*, set aside the submission and restored the case to the calendar in order that evidence regarding the use of such structural steel sections in the United States, if available, could be placed upon the record.

At the second trial, plaintiff introduced the testimony of Robert Mayhew, who is associated with the firm of Stewarts & Lloyds, U.S.A., Ltd., a wholly owned subsidiary company of Stewarts & Lloyds of London, the manufacturer of the merchandise at bar; also, the testimony of Wayne Whitted, a salesman in the employ of the plaintiff company.

Mayhew produced a motion-picture film, which he obtained from the parent company in London, showing the process of manufacture and the use of merchandise such as exhibits 1, 2, 3, and 4. This film was later received in evidence as exhibit 12. After examining exhibits 1, 2, 3, and 4, and the testimony of McMinn, the witness stated, in substance, that there was no difference between the process of manufacture described by McMinn and the process depicted in exhibit 12.

Witness Whitted, who had been in the employ of the plaintiff company slightly over 1 year, was formerly employed by the Calumet Steel Corp. as a sales engineer for approximately 3 years. Among the things he sold during that period, were two sizes of rectangular hollow sections, produced by Calumet Steel. Whitted was employed for a period of time, not stated, as a sales engineer with the Armco Steel Corp. and, with that company, he promoted the sale of a wide range of products "including another form of rectangular hollow sections which are produced by the electric resistant welded method. They also produce structural sections and a wide range of flat products." Prior to his business engagements above described, Whitted attended college at the University of Wisconsin, from which he graduated with a bachelor degree in civil engineering. His college course included the study and the use of structural members and the application of forces and loads to the use of structural members. Whitted stated that exhibits 1, 2, 3, and 4 were similar in shape to the products he had offered for sale while employed with Armco and Calumet. He had seen merchandise like exhibits 1, 2, 3, and 4 used in the United States in the following localities: Metropolitan Chicago, throughout Illinois and Wisconsin; in New Orleans, Miami, and New York City.

Whitted testified that the principal use of merchandise like exhibits 1, 2, 3, and 4 was as a column in commercial, industrial, and school projects, stating that a column is a "supporting member for the roof or for the side walls of a building."

Whitted had been engaged in selling Stewarts & Lloyds' products, such as exhibits 1 through 4, for 1 year and had dealt in merchandise, similar to exhibits 1 through 4, manufactured in the United States for a period of 9 years.

Having actually made rectangular hollow sections, and having followed their uses into consumption, Whitted had acquired personal knowledge of the load-bearing properties and structural characteristics of such merchandise. He stated that "Exhibit 2 has excellent strength to weight characteristics" and would normally be used as an interior column; that exhibit 4 would normally be used as an exterior column, because of its high strength to weight characteristics. Whitted stated that exhibits 1 through 4 had the same properties and characteristics which adapted them to the structural uses of similar rectangular hollow shapes, represented by exhibits 17, 18, and 19, which are made and used in the United States.

Plaintiff's four witnesses were men of experience, intelligence, and probity, and their testimony is not rebutted. The evidence with respect to the material, construction, character, quality, and use of the imported rectangular hollow sections in England identifies them as structural shapes within the standards recognized by our courts.

The testimony also establishes that similar rectangular hollow sections possessing the same essential characteristics are manufactured and used in the United States for structural purposes.

Upon the established facts, the conclusion logically follows that the rectangular hollow sections, represented by exhibits 1 through 4, are structural shapes within the purview of the authorities discussed below.

The provision for "structural shapes" has been a controversial subject in many judicial decisions under the present and earlier tariff acts. The courts have not attempted to lay down a precise definition of structural shapes, stating that "Each case must be determined in the light of its record." *Otis McAllister & Co.* v. *United States*, 27 C.C.P.A. (Customs) 4, C.A.D. 52; *Judson Freight Forwarding Co.* v. *United States*, 20 C.C.P.A. (Customs) 229, T.D. 46038; *The Frost Railway Supply Co.* v. *United States*, 39 C.C.P.A. (Customs) 90, C.A.D. 469.

A case upon this subject which has been cited, followed, or distinguished in a great many instances is *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T.D. 37537. The court there held, *inter alia*, that certain steel bars or grates, ready to be assembled as parts of a mash filter, were properly classifiable as

structural shapes in paragraph 104 of the Tariff Act of 1913. In reaching its conclusion, the court stated that the word "structure" carried with it the idea of size, weight, and strength, and that the expression "structural shapes" imported in general "* * * a capacity to sustain heavy weights or to resist great tension * * *."

In *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T.D. 42184, the court expressed the opinion that a structural shape should be "* * * so made as to combine the greatest strength with the least weight and is exclusively used in erecting structures."

In *Judson Freight Forwarding Co.* v. *United States*, 20 C.C.P.A. (Customs) 229, T.D. 46038, the court held that the term "structural shapes" was intended to embrace iron or steel members designed to withstand relatively heavy weights with minimum use of material.

In *United States* v. *The Winkler-Koch Engineering Co.*, 41 C.C.P.A. (Customs) 121, C.A.D. 540, the court held that certain hot-rolled, hollow, cylindrical seamless sections, used, when joined together, to form a casing for an oil well, were properly classifiable as structural shapes and, since the ends of the sections had been threaded, they were held to be "advanced beyond rolling by machining, and fabricated for use" within the meaning of paragraph 312 of the Tariff Act of 1930.

In the *Winkler-Koch* case, the appellate court reviewed several of its earlier decisions, some of which are referred to above, and, recognizing that it would be impossible "* * * for the courts to lay down a rule and declare that such rule settled the questions of what is and, therefore, what is not a structural shape within the meaning of paragraph 312," it proceeded to say "However, deductions may be drawn from decided cases, many of which are herein cited, covering at least some of the characteristics which an article must possess in order to be properly classifiable as a structural shape * * *." In brief, the term embraces iron or steel members capable of sustaining relatively heavy weights with a minimum use of material and used for structural purposes.

The unrefuted and uncontradicted testimony of the plaintiff's witnesses establishes that the involved rectangular sections were designed and developed for use in the construction of buildings. Theoretical and practical tests demonstrated their uses where I-beams, girders, columns, and other conventional forms had formerly been employed. In our opinion, the testimony establishes that the subject sections meet the required standards for classification as structural shapes.

The Government contends that lack of proof of use of the rectangular sections in the United States is prejudicial to the claim that said sections are structural shapes, and the testimony as to their use in England or other parts of Europe is unimportant.

Although the imported rectangular sections have not gained a general use in the United States, since they are a new concept in commerce, nevertheless, they were shown to have the basic characteristics of some of the exemplar structural shapes, enumerated in paragraph 312, and to possess the standards for classification in said paragraph.

As stated by the Supreme Court of the United States in *Newman* v. *Arthur*, 109 U.S. 132 (1883)—

The fact that at the date of the passage of the act goods of the kind in question had not been manufactured, cannot withdraw them from the class to which they belong, as described in the statute, where, as in the present case, the language fairly and clearly includes them.

The *Newman* case was cited and followed in *Pickhardt* v. *Merritt*, 132 U.S. 252 (1889), wherein it was held that—

* * * the term "aniline dyes and colors, by whatever name known," included articles which should be commercially known, whenever afterwards imported, as "aniline dyes and colors." * * *

The above cases were cited and followed in *United States* v. *Sehlbach et al.*, 90 Fed. 798 (1898).

In a later case, decided by this court, it was held that mafura tallow, extracted from the seed of a tree grown in Mozambique, Portuguese East Africa, was entitled to classification as a substance commonly used in soapmaking. The court rejected the contention of the Government that the fact that such tallow had not been previously imported into and, therefore, not used in the United States in the making of soap, precluded it from classification as an article commonly used in soapmaking. *Perry, Ryer & Co.* v. *United States*, 28 Treas. Dec. 385, T.D. 35221 (1915), cited and quoted with approval in *E. T. Seward* v. *United States*, 34 Treas. Dec. 393, T.D. 37622 (1918), and *Greene Trading Co., Inc.* v. *United States*, 43 Cust. Ct. 60, C.D. 2103 (1959).

The uncontroverted testimony of record leads us to the conclusion that the subject merchandise is unquestionably of the class or kind which entitles it to be classified for duty in paragraph 312 as structural shapes. The testimony of McMinn, describing in detail the method of production of the merchandise, clearly indicates that it did not become structural shapes until it appeared in the rectangular form by a process primarily of rolling. Therefore, the sections in controversy are structural shapes, not assembled, manufactured, or advanced beyond hammering, rolling, or casting, and dutiable at one-tenth of 1 cent per pound.

In view of our disposition of the case, it becomes unnecessary to pass upon the question whether the imported sections are tubes, within the meaning of paragraph 328. As we stated in *The Winkler-Koch Engineering Company* v. *United States*, 30 Cust. Ct. 26, C.D. 1494—

affirmed in *United States* v. *The Winkler-Koch Engineering Co.*, *supra:*

Being of the opinion that the casings in controversy are in fact and in law "structural shapes," it is a question of no particular importance here whether or not they may also be "pipes" or "tubes." It is obvious that the enumeration of structural shapes in paragraph 312 is a use provision which the courts have held, in the absence of compelling reasons to the contrary, prevails over an *eo nomine* or a descriptive provision.

We find and hold, upon the record before us, that the forms in controversy were designed and produced solely for structural purposes; that they possess the characteristics, properties, and qualities of supporting heavy loads with a minimum of material; and that, during the period of their use, they perform the essential structural function of supporting the building in which they are used. In short they are, in fact, structural shapes within the meaning of paragraph 312. Furthermore, they are not advanced beyond hammering, rolling, or casting.

We, therefore, sustain the protest claiming the importation in question dutiable at one-tenth of 1 cent per pound as provided in said paragraph 312.

Judgment will issue directing the collector of customs to reliquidate the entry accordingly.