(C. D. 1577)

HUMBLE OIL & REFINING CO. ET AL. v. UNITED STATES

United States Customs Court, Second Division

(Decided January 14, 1954)

*Sharretts, Paley & Carter* (*Joseph F. Donohue, Louis J. Paley*, and *Howard C. Carter* of counsel) for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action arose at the port of Houston, Tex., by virtue of three protests, which are enumerated in the schedule of protests attached to and forming part of this decision. They were filed pursuant to the provisions of § 1583, United States Code, title 28, and consolidated for the purposes of trial and decision.

Certain imported articles, described in the record as "seamless A. P. I. casings" (or by similar descriptive terms), of various diameters, lengths, and weights, were classified for duty by the collector of customs in accordance with the provision in paragraph 328 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 328) for "* * * all other finished or unfinished iron or steel tubes not specially provided for * * *." The statutory rate of duty for such merchandise—25 per centum ad valorem—was reduced to 12½ per centum ad valorem by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T. D. 52462.

Plaintiffs rely upon the claim that the subject merchandise should be classified as "structural shapes of iron or steel * * * advanced beyond hammering, rolling, or casting * * *" in paragraph 312 of said act (19 U. S. C. § 1001, par. 312) and subjected to duty at the rate of 10 per centum ad valorem, if entered between January 1, 1948, and June 5, 1951, inclusive, in accordance with the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, effective January 1, 1948, or at 7½ per centum ad valorem, if entered on or after June 6, 1951, in accordance with the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739.

It is not disputed that the merchandise in controversy is substantially like that which was before this court in the case of *The Winkler-Koch Engineering Company* v. *United States*, 30 Cust. Ct. 26, C. D. 1494, affirmed in *United States* v. *The Winkler-Koch Engineering Company*, 41 C. C. P. A. (Customs) 121, C. A. D. 540. Inasmuch as the record in that case is not incorporated herein, it becomes necessary for us to review the voluminous record upon which the present case was submitted in order to reach a proper conclusion.

At the trials at New York and at Houston, Tex., plaintiffs introduced the testimony of nine witnesses upon the merits of the case, and it was stipulated that if three other named witnesses had been called, they would have testified in the same manner as one of the plaintiffs' previous witnesses, and that the record should stand as if such testimony had been orally introduced.

In addition to the testimonial record, three motion-picture films were introduced by the plaintiffs, describing in graphic detail the use of oil-well casings and the forces to which they are subjected in their construction and operation. Schematic diagrams and numerous other

exhibits, consisting of sketches, specifications, pamphlets, tabulations, photographs, films, books, et cetera, were also received in evidence and, without giving a detailed description of them here, they will be referred to wherever necessary in the course of this opinion.

Defendant offered no evidence in rebuttal.

The nine witnesses who testified on the merits of the case in behalf of the plaintiffs are the following:

Randolph E. Wright, at present assistant division petroleum engineer in the producing department of The Texas Co., Houston, Tex., graduated from the University of Texas in 1942, receiving the degree of petroleum engineer, after which he spent 3 years in the United States Navy, Naval Reserve, primarily engaged in engineering work, and during that period taught Diesel engineering in the Navy at the University of California at Berkeley and at Cornell University at Ithaca, N. Y. Since 1946, he was engaged in various engineering capacities with The Texas Co.

Peter A. Mills, owner of the Moody Engineering Co. of Pittsburgh, Pa., inspector of material, equipment, and machinery, who began work with respect to the inspection of casing in 1914.

C. A. Dunlop, in the employ of the Humble Oil & Refining Co. since 1924 in the various capacities of engineering draftsman, senior engineer, supervising engineer, and senior supervising engineer, being in charge of equipment engineering and equipment standardization of the production department of the Humble company, whose business is the production, refining, and marketing of petroleum and its products.

Lawrence J. Vittrup, employed by The Texas Co. since 1933, and, since 1937, senior geologist in the South Texas division of the producing department of that company, which is engaged in the production, refining, and sale of petroleum and its products.

Terrell V. Miller, in the employ of the Humble oil company since 1935, and, since 1949, supervising petroleum engineer in charge of the material-management group of the petroleum engineering division and production department of that company.

William G. Freitag, employed by the American Republics Corp. and its affiliates, oil producer and refiner, since 1920, and, since 1933, purchasing agent for that corporation.

Norbert C. Draper, employed by the Shell Oil Co. for 26 years in various capacities and presently engaged as buyer of oil country goods for his company.

It was agreed between the parties that the three witnesses whose names, positions, and years of experience are listed below, would testify to the same effect as the witness Draper:

S. M. Stanley, purchasing agent, Pan American Production Co., 18 years.

George M. Larson, purchasing agent, Standard Oil Co. of Texas, 40 years.

J. C. Calkins, purchasing agent, Humble Oil & Refining Co., 20 years.

The last two witnesses were M. H. Hough, purchasing agent for the Amerada Petroleum Co. since 1927, and Wilfred S. Crake, who was for 26 years with the Shell Oil Co., engaged in the production, refining, and marketing of petroleum products, started with the company as a trainee engineer, and has held various engineering jobs, production-operating jobs, production foreman, district foreman, senior mechanical engineer, division mechanical engineer in the field, construction engineer, electrical engineer, division production manager, and, at present, chief mechanical engineer for the Houston office of the Shell Oil Co.

These witnesses were men of unchallenged ability, intelligence, and integrity, each of whom was familiar with the nomenclature, terminology, and technology in his particular line of activity in the great oil-producing centers of southwestern United States where they held responsible positions of great importance.

Since no evidence was introduced on behalf of defendant, the testimony and other evidence introduced by plaintiffs stand uncontradicted, unrebutted, and unimpeached.

The importations consisted of hollow, cylindrical, seamless sections of steel, produced by a hot-rolling process, with various outside diameters, ranging from 5½ inches to 10¾ inches, although it appears from the record that casings may range in outside diameters from 4¼ inches to 20 inches. They vary in length from 20 to 30 feet, approximately, and are made to conform to rigid American Petroleum Institute standards so that whenever and by whomever casings are made bearing the A. P. I. stamp, the purchaser is assured that they meet with the specifications of the Petroleum Institute.

The process of drilling a well and installing the casings was explained in great detail by plaintiffs' witness Wright. He testified that the drilling of a well, illustrated by reference to a 12,000-foot well, begins with the assembling of drilling equipment in the rig or derrick over the spot that has been indicated as a prospective oil site. The bit is attached to the drill pipe through which mud is pumped. The power unit turns the drill pipe in a clockwise rotary motion and, as the bit descends into the earth, the mud fluid is forced through the drill pipe around the bit and up again to the surface of the earth where it is piped back to the mud pit and recirculated. The mud serves not only to cool the bit but also to carry the cuttings to the surface and maintain constant pressure against the sides of the hole to counteract the normal pressures of the earth which would otherwise cause cave-ins that would damage the hole. When the hole has been drilled to a depth of approximately 1,500 feet, the drill pipe is

drawn to the surface of the earth, disjointed, and stored away for future use. The mud is maintained in the hole to preserve the pressure necessary to hold back the sides of the wall.

At this point, casing is lowered into the hole, the first joint being protected by a so-called float shoe, so constructed that it will permit fluids to pass through it from the inside but will permit nothing to enter from the outside. Each length of casing is filled with mud as it is lowered into the hole and, in this way, the pressure between the inside wall and the outside wall of the casing is maintained in equilibrium. Each additional joint of casing is screwed into place as it is lowered, and this operation is continued until the casing lines the depth of the first hole dug, in this illustration, 1,500 feet. This is referred to as the surface string.

The next step is to pour cement into the inner wall of the casing under pressure that operates to force the mud through the float shoes and up the sides of the casing to the surface. In this way, sufficient cement poured down the hole would act as an anchor between the outside casing and the surrounding earth. Then, more mud is used to force the cement through the float shoes and through the space between the outside diameter of the casing and the hole. When the entire area is filled with cement, operations are suspended long enough to permit the cement to harden and "freeze" the casing into position.

This being accomplished, a smaller bit of sufficient size to pass through the inner wall of the surface casing is attached to the drill pipe, lowered to the bottom of the casing, and from that point the drilling operation continues as in the first instance. A hole is dug at this smaller diameter, approximately 9 inches, to a depth of about 7,000 feet. When the drilling equipment is withdrawn, a string of smaller diameter casing is run from the surface of the ground to the bottom limits of the new hole and is cemented in place at the bottom of the string, which is known as the protection string. The cement is not forced up the sides of the string for its entire distance but only for about 300 or 400 feet. Then, the drilling equipment is assembled again with the bit sufficiently narrow to permit its passage through the protection string. The drilling operation continues until the prospective oil reservoir has been reached.

At this point, the services of geologists become important. As the drilling increases in depth, the cuttings forced to the surface by the pressurized flow of mud are examined by geologists for evidence indicating the presence or absence of oil. When the oil sands have been reached, the drill pipe and bit are again removed from the hole, and what is known as the production string is run into place. Both the protection string and the production string are fastened at the surface of the earth to an apparatus known as the casing head, which is suitably constructed to hold the entire weight of both strings in suspen-

sion. To reach the prospective deposit of oil surrounding the exterior wall of the lowest length of casing, a specially designed piece of equipment, known as a perforation gun, loaded with shells in sufficient capacity, is lowered to the bottom of the hole, and the shells are fired by an automatic electrical device which perforates the wall of the casing and permits the oil to flow into the bottom length of casing. The deposit of oil, being under pressure, is held in check by the weight of the mud column in the casing which has been increased in density to counteract the anticipated increase in pressure. In this way, the oil is held under control until a tube sufficient in size to fit within the wall in the casing is lowered into place. A choke collar normally is attached to prevent the oil from rising in the annular space between the inner casing and the tubing. When the tubing is in place, the column of mud that has been maintained within it is removed by a swabbing operation and, with this pressure check released, the oil flows to the surface of the earth through the tubing and is piped to storage containers which have been established for that purpose.

Ordinarily, the force which brings the oil to the surface of the earth against existing forces of gravity is gas pressure which is naturally present in oil deposits. Eventually, however, the pressure diminishes to the point where it does not lift the oil from the earth in sufficient volume to result in profitable production, and artificial lifts are necessary. The most common lift is the power-motivated pump. Prior to its installation, the oil well must be shut down, the pressure checked with the column of mud, and the tubing removed. Then, the pump is installed at the bottom of the well, and power is then transmitted to it through a string of "sucker rods," attached to its pumping arm and run to the surface of the earth. The tubing is run again and the sucker rods are attached to a power unit at the surface of the earth, and the oil is thus raised through the tubing.

The foregoing recital gives some idea of the time, labor, and expense involved and the magnitude of the operations incident to the construction of an oil well.

Obviously, casing is subjected to various stresses and loads during both the installation and the operation period. To insure that the steel has the necessary strength to withstand such loads, a constant and careful check is maintained of every batch of oil-well casing that is manufactured.

Witness Mills of the Moody Engineering Co. of Pittsburgh testified that the standard requirements for casing were first prescribed by the American Petroleum Institute in 1924, and it is not disputed that oil-well casing has been made with A. P. I. specifications since 1930. Casing is tested in accordance with A. P. I. specifications to determine its tensile strength, yield strength, and percentage of elongation,

these tests being deemed necessary to determine the performance properties of casing under field conditions.

Mills also testified that there are four grades of casing known, respectively, as F–25, H–40, J–55, and N–80, the numbers indicating the capacity of the steel to carry a load in thousands of pounds, that is, J–55 casing is capable of carrying a load of 55,000 pounds per square inch without taking a permanent stretch.

By way of comparison, it was shown by this witness that the capacity of building and bridge steel to carry a load is also calculated, standardized, and reported in publications of the A. S. T. M. (American Society for Testing Materials); that beams, girders, joists, and such articles commonly known as building and bridge steel, have a yield strength of 33,000 pounds per square inch. Consequently, they have a less load-carrying capacity than three of the four grades of casing.

At one stage of the trial, three motion-picture films entitled, respectively, "Running and Handling Casing," "Birth of an Oil Field," and "Oil," were received in evidence as accurate portrayals both in scene and in sound of the operations incidental to the manufacture and installation of oil-well casing and its subsequent use. The members of the second division of this court were accorded an opportunity to see these films in operation which were interesting, enlightening, and beneficial.

The testimonial record in this case is voluminous and it would prolong this opinion to unnecessary lengths if it were attempted to dissect it in great detail. Suffice it to say that, based upon the undisputed testimony of the many witnesses who appeared in this case, all of whom were well informed and proficient in their particular field of operation, the following facts are established beyond peradventure:

1. Throughout the principal oil fields of the United States the subject merchandise is known as casing and not as tubes.

2. The merchandise is in all material respects like that which formed the subject of consideration by the court in the *Winkler-Koch* case, *supra*, which was held to be properly classifiable as structural shapes.

3. Said merchandise was made in strict accordance with specifications of the A. P. I. (American Petroleum Institute) so that any casing bearing the stamp of the A. P. I. would be a guaranty that whether made by one steel company or another the identical merchandise would be delivered upon an order for casing.

4. The uncontradicted testimony introduced by plaintiffs, reinforced by the recognized A. P. I. specifications and standards, as well as by authoritative textbooks and publications on the subject, establishes plaintiffs' contention that casing is not known in the oil trade

as tubes or tubing but is clearly differentiated (a) in size, casing having a substantially greater diameter than tubes; (b) in weight; and (c) in use.

5. With respect to use, casing may be run to great depths, and serve a dual purpose (a) as a support to the wall of the hole that has been drilled and (b) as a protective medium for the tubing which is run inside the casing by means of which the oil is brought from subterranean sources to the surface. To perform these functions, the casing is made according to the specifications of the A. P. I. to withstand not only great hydrostatic pressure from the outside which might cause the casing to collapse, but also bursting pressure from the inside, as well as vertical pressure and tension.

6. Casing as a rule becomes a permanent fixture in the construction of a well since it is cemented in, while tubing may be withdrawn from time to time for use in other wells.

A phase of the case which requires our special consideration arises from the fact that certain trade catalogs, identified as exhibits 10 to 16, inclusive, were tentatively received in evidence by the trial judge at Houston but, at the same time, a ruling upon their admissibility was reserved for this division. Moreover, considerable oral testimony relating to these exhibits was received over objection with the same reservation that the admissibility of such evidence should be reviewed by the division. However, since counsel have not acquainted us with those portions of the record, either documentary or testimonial, which were at the time of trial deemed inadmissible, we shall not search the record for that purpose, and since our conclusion will be reached without reference to them, it is the ruling of the division that exhibits 10 to 16 and any evidence relating to them shall remain in the record.

In its defense of the collector's classification, defendant in its brief states that—

Wherefore the Government entered into the trial of this case, not with the purpose of presenting any new facts as to the use of the casing involved—we knew how they were used and the purposes for which they were used—but to present if possible facts upon which the doctrine of ejusdem generis might be predicated, to wit, facts which would indicate that the casings herein, *although structural shapes*, were not of the same class or kind of structural shapes as the articles enumerated in paragraph 312 of the Tariff Act of 1930, and were therefore excluded from classification under the language "all other structural shapes of iron or steel." [Italics supplied.]

Consequently, the only point argued by defendant in this case is that the doctrine of *ejusdem generis* operates to exclude the casing herein from paragraph 312, *supra*, although admittedly structural shapes. The gist of defendant's argument seems to be that while the exemplar articles (beams, girders, joists, angles, and so forth) enumerated in paragraph 312 are made to conform solely to the A. S. T. M.

specifications, casing is controlled only by A. P. I. specifications, thereby indicating an entirely different class of merchandise. This contention, however, is untenable.

In the *Winkler-Koch* case, *supra,* our appellate court, in a very searching analysis of all the cases on the subject of structural shapes which have been reviewed by it, beginning with its decision in *Simon, Buhler & Baumann, Inc.* v. *United States,* 8 Ct. Cust. Appls. 273, T. D. 37537, said to be "the pioneer case on the subject matter of 'structural shapes,'" laid at rest the extent to which the principle of *ejusdem generis* could be applied to said paragraph 312. Consequently, it would be presumptuous for this court to attempt to clarify or enlarge upon the doctrine of *ejusdem generis* so well considered and expressed by Chief Judge Garrett, speaking for our appellate court in the *Winkler-Koch* case. To uphold the theory now advanced by the defendant, would run counter not only to the *Winkler-Koch* decision but as well to the other authorities on the subject therein cited and reviewed.

In its opinion in the *Winkler-Koch* case, *supra,* when discussing the rule of *ejusdem generis,* our appellate court said in part—

\* \* \* deductions may be drawn from decided cases, many of which are herein cited, covering at least some of the characteristics which an article must possess in order to be properly classifiable as a structural shape and there is, doubtless, room for resort to the rule of *ejusdem generis* for purposes of comparison, but it should be borne in mind that, with the exception of what we regard as *obiter* in the majority opinion in the *European Trading Co.* case, *supra,* no case involving "structural shapes" such as those contemplated by that phrase in paragraph 312, *supra,* has been cited (nor has any been found) in which any appellate court rested a decision upon the ground that the article involved should be excluded from classification under the paragraph by reason of the rule of *ejusdem generis.*

For "purposes of comparison," it is noteworthy that casing has the fundamental characteristics of the exemplar structural shapes enumerated in paragraph 312. It is designed to carry maximum loads with a minimum of material, and, by its cylindrical construction, is adapted and used to resist the forces of tension, torque, collapse, and burst, that are encountered in the construction and operation of an oil well.

In passing, we deem it appropriate to say that the case has been skillfully presented by counsel for both sides who have displayed a high degree of intelligence, industry, and research in preparing the case for our consideration.

For the foregoing reasons and in accordance with the applicable principles of decision laid down in the various authorities cited, we find and hold upon the record herein that the subject casings are not tubes, as classified by the collector of customs, but that they are structural shapes of steel, advanced beyond the condition of hammering, rolling, or casting, within the purview of paragraph 312, *supra,*

and sustain the claim of plaintiffs that the merchandise is dutiable at the appropriate rates provided by paragraph 312, *supra*, as modified.

Judgment will be entered accordingly.