(C. D. 2003)

HUMBLE OIL & REFINING CO.
LESLIE B. CANION ET AL. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 9, 1958)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for the plaintiffs.
*George Cochran Doub,* Assistant Attorney General (*Richard E. FitzGibbon, Richard H. Welsh,* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action relates to importations of certain tubular steel material of varying diameters and approximately 30 feet in length, covered by the protests enumerated in schedule "A," attached to and made part of the decision herein. The merchandise is more particularly described and known as API tubing and API line pipe, the initials "API" being an abbreviation for American Petroleum Institute.

The collector of customs classified the merchandise as steel tubes, not specially provided for, in paragraph 328 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 328), as modified by the Annecy Protocol

to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T. D. 52462, and duty was imposed thereon at the rate of 12½ per centum ad valorem.

Plaintiffs claim that both of the above items should be classified in paragraph 312 of said act (19 U. S. C. § 1001, par. 312), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, as "all other structural shapes of iron or steel" and that all sizes of the line pipe, with one exception, are properly dutiable at one-tenth of 1 cent per pound on the ground that they are "not assembled, manufactured or advanced beyond hammering, rolling, or casting." Since the tubing and one size of line pipe are admittedly machined by a threading operation, it is claimed that those items are dutiable at 7½ per centum ad valorem in said paragraph 312, as modified, *supra*.

The text of the statutes pertinent here is quoted below:

Paragraph 328, as modified, *supra*:

Finished or unfinished iron or steel tubes not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other _____ 12½% ad val.

Paragraph 312, as modified, *supra*:

Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

    Not assembled, manufactured or advanced beyond hammering, rolling, or casting _____ 0.1¢ per lb.

    Machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting _____ 7½% ad val.

### THE EXHIBITS

Plaintiffs introduced the following exhibits:

Exhibits 1 and 2—Charts as aids in illustrating the testimony of a witness.

Exhibit 3—Pamphlet containing specifications for tubing, grades F to N.

Exhibit 4—Pamphlet containing performance properties of tubing, grades F to N.

Exhibit 5—Document containing specifications relating to the physical and chemical properties of API line pipe.

Exhibit 6—Copy of the publication of ASTM (American Society for Testing Materials) standards for structural steel.

Exhibit 7—Motion-picture film illustrating the process of laying a pipeline.

Exhibit 8—Piece of pipe representative of one size and diameter of plain end line pipe.

Exhibits 9 and 10—Charts as aids in illustrating the testimony of a witness.

Defendant offered in evidence exhibit A, a drawing showing external upset threading.

Plaintiffs introduced nine witnesses, the testimony of three of whom was submitted by stipulation.

The defendant called six witnesses, the testimony of four being submitted by stipulation.

Plaintiffs' witnesses consisted of the following:

Randolph Earle Wright, a member of the staff of the general manager of the producing department of the Texas Co. at Houston, Tex., engaged in a training assignment in the various phases of production, engineering, management, and executive training, testified that, since joining the Texas Co. in 1946, he has served in various engineering capacities, working in the field in the actual drilling, construction, installation of equipment for the production of oil and natural gas, and also in the offices engaged in the design of such equipment.

Charles A. Dunlop, coordinator of equipment engineering in the production department of the Humble Oil & Refining Co. supervising the testing, selection, standardization, and specification of equipment used in the production of oil and gas, stated that he graduated from the University of Liverpool, England, in 1922, majoring in marine engineering and naval architecture. As coordinator, his duties involve the selection, use, and specification of materials, and, with respect to tubular goods and materials, he participates in the selection and design of casing, tubing, and also the use of drill pipe. He has been with the Humble Oil & Refining Co. since 1924 and is associated with the American Petroleum Institute, which is recognized as a national trade association promoting the study of the arts and sciences concerned with the production of oil and gas.

Terrell V. Miller has been employed by the Humble Oil & Refining Co. approximately 21 years and, at present, is senior supervising petroleum engineer. He is a graduate of Iowa State College with a B. S. degree in mechanical engineering. For approximately 10 years, he worked in the field in connection with the drilling and production of oil wells. This work entailed the designing of pipeline systems or structures which would transport the oil from oil or gas wells to tank batteries and to gas plants.

Russell K. Schulze is assistant manager and technical adviser of the pipeline section of the Shell Oil Co. That company is engaged in the exploration, production, transportation, manufacture, and marketing of petroleum and its products. During his 19 years with the Shell Oil Co., in addition to his duties as technical adviser, he has

been employed as chief engineer, being responsible for the design and construction of pipeline systems not only in the United States, but throughout the world. During the early years of the late war, he was engaged in the design of a military pipeline system, of which some 25,000 miles were constructed.

Frank O. Stivers, chief engineer of the Humble Pipe Line Co., which is described as a common carrier of petroleum, transporting by pipeline crude oil and refined products in the State of Texas, is a graduate of Purdue University with a B. S. degree in mechanical engineering. He has also been employed by the Southeastern Pipe Line Co. and the Plantation Pipe Line Co., both of Atlanta, Ga.; the Allied Oil Corp. of Chicago; and, during the past 11 years, the Humble Pipe Line Co., engaged in pipeline engineering. He has designed pipelines in connection with the various companies by which he has been employed and has used API line pipe in diameters up to 20 inches.

The next witness was Albert Pecore. It was stipulated that this witness, who is vice president of the Humble Pipe Line Co. and who was associated with that company for 38 years in the engineering department, would give substantially the same testimony as that of the previous witness, Frank O. Stivers.

Francois M. Rouget de Gourcez is a salesman and technician with Comptoir F. B. T., a company which is the sales department for all French, Belgian, and Saar pipe mills. He is also permanent treasurer of the oil country goods technical committee and supervisor of manufacturing operations to the extent that they involve compliance with API specifications on tubing, line pipe, and other oil country tubular goods. He testified that he had observed the process of manufacturing API line pipe such as that in question in this case and which he described in detail.

With respect to the witness Kurt Orban, it was stipulated that he would testify that he had observed the process of manufacturing pipe in the Rheinsche plant in Dusseldorf, Germany, where some of the subject merchandise was produced, and, further, that, if he were asked the questions on the process of manufacture that were propounded to M. Rouget, he would give the same answers relative to the merchandise made by the Rheinsche company.

Regarding the witness Dr. Gerhard Wagner, it was stipulated that he would testify, with respect to that portion of the subject merchandise which is manufactured in the Mannesmann plant in Germany, that he had observed the process of manufacturing seamless API line pipe at that plant; and that his testimony would be substantially the same as that of the witness Rouget.

Defendant introduced the following witnesses:

Jacob C. Siegle has been general superintendent of the tube division of the Youngstown Sheet and Tube Co. since 1936, which company is

engaged in the manufacture of general steel products, principally pipes and sheets. He has been employed by that company since 1913 in various capacities, which experience has familiarized him with pipe mills. He has observed the manufacture of such structural shapes as channels, I-beams, Z's, and Z bars, and stated that line pipe is made to API specifications in order that it may have good welding qualities and be sufficiently ductile to be bent to the contour of a ditch and that it must possess the bursting strength set forth by the API specifications.

William M. Frame, director of research and technology with the National Tubes Division of the United States Steel Corp., demonstrated his qualifications in the field of manufacturing steel, especially line pipe.

It was stipulated between adversary counsel that if George Tyson, associated with the Jones & Laughlin Steel Corp. since 1938; Joseph Mahan, for 34 years in the employ of the National Supply Co.; Giles Locke, connected with the Republic Steel Corp. for 21 years; and John Wais, Jr., in the employ of the Pittsburgh Steel Co. for 20 years, were called as witnesses, they would testify substantially as did Mr. Frame.

These witnesses were all skillfully trained men of unquestioned probity, with wide experience and a broad knowledge of the terminology and technology of the petroleum industry in its various phases, particularly with relation to the character, design, material, construction, and special qualities appropriate to the effective and economic utility of API tubing and API line pipe in the erection of oil wells and pipelines.

The testimonial record is voluminous, and it would extend this opinion unduly to quote extensively from it and, since there is little, if any, substantial dispute on the salient features of the case, it is deemed sufficient to state in narrative form the controlling facts upon which our decision must rest.

The questions of law we are called upon to determine are whether the articles above described are structural shapes within the intention of paragraph 312, *supra,* and, if so, whether the line pipe is not assembled, manufactured, or advanced beyond hammering, rolling, or casting within the meaning of said paragraph, as claimed by plaintiffs.

Inasmuch as the API tubing and the API line pipe are employed in separate fields of operation, we shall treat them independently insofar as may be deemed desirable.

## API Tubing

The seamless steel API tubing in controversy is in lengths of approximately 30 feet, with outside diameters of 2⅜ inches and 2⅞ inches and, in its imported condition, is threaded for coupling.

It appears from the record that tubing is of five different categories, depending upon the wall strength of its steel. The lowest is API grade F–25, indicating that the steel has a yield strength of 25,000 pounds per square inch. Yield strength is defined as a measure of the tensile load that the steel will carry before it will stretch or yield to the point of permanent deformation. The strongest category of tubing is called T–105, indicating a yield strength of 105,000 pounds per square inch.

In the construction of an oil well, after the hole has been dug and the steel casing has been set into place, the tubing is installed within the casing to provide a passageway through which petroleum may be brought from its subterranean source to the surface of the earth. In the process of installing the tubing, each length is coupled to the preceding length, and this procedure is followed until the petroleum deposit in the well is reached. Since the record discloses that oil wells frequently run to a depth of 10,000 feet or more, it is obvious that, at the time of installation and in its normal life, tubing sustains a tensile load of substantial proportions because each length must carry the weight of all succeeding lengths beneath it and, of course, the top joint of tubing must sustain the weight of the entire string.

Moreover, tubing is subject to the force of collapse exerted by the weight of the column of mud which is present in the space between the casing and the outer wall of the tubing. The tubing is also subject to the force of burst from the pressure of the petroleum coming through the string of tubing.

Inasmuch as these forces and loads are often exerted in combination against the tubing, it is necessary that the grade of tubing used must be able to withstand the maximum anticipated force and loads with an adequate safety factor and with the minimum use of material. These forces and loads vary with the conditions encountered in each well, in the construction of which the aim of the builders is to make the most efficient use of the tubing above referred to with due regard to the forces which may be anticipated.

## API LINE PIPE

From the record, the following information is gathered with respect to the line pipe herein having diameters ranging from 2⅜ inches to 14 inches. API line pipe, like API tubing, is fabricated in accordance with rigid specifications of the American Petroleum Institute, in order to secure uniformity in the design, grade, quality, construction, and utility of the steel sections and, at the same time, obtain the highest degree of efficiency with the use of a minimum quantity of steel material.

As indicated herein, line pipe is used for the transportation of petroleum and its products. The smaller diameters, up to 4 inches, are used to construct so-called "gathering" systems that convey petroleum

from the wellhead in the oil field to the pipelines. Larger diameters are used to transport petroleum to the refinery. They are also employed to build "product lines" that carry finished petroleum products from the refinery to the delivery depots from whence they go by truck or barge to their markets.

In order to propel petroleum and its products through pipelines, energy comes from pressure generated by pumping stations at designated points along the pipeline. This pressure, which ranges in magnitude from 800 pounds to 1,500 pounds per square inch, is the greatest single force or load which a pipeline must carry. Consequently, line pipe is designed in various sizes and wall thicknesses to accommodate an anticipated volume of petroleum or products at pressures within the strength limits of the pipe. This pressure supplies the force and regulates the speed at which a given cargo travels to its destination through the transmission line and, as disclosed by the evidence, it imparts to the contents of the line a characteristic known technically as chaotic "turbulence," which causes the fluid to swirl and churn within the line as it is pushed to its destination. An interesting physical phenomenon requires that, under such pressure, fluids of different gravities churning within a pipeline will not commingle as they would if the pressure were reduced. Consequently, it is possible to transport quantities of fuel oil, kerosene, and various grades of gasoline in sequence through the same pipeline. The turbulence caused by the pressure prevents intermixing as the products travel through the line, and they may be drawn off at the same point or at different points with no appreciable loss or downgrading resulting from commingling. It is recognized that line pipe is constructed in various sizes and wall thicknesses to accommodate the anticipated volume and pressure in a given line with a minimum use of steel.

It is known that the pressure exerted against the wall of the pipe increases proportionately to the diameter of the pipe. For example, if a pipe 8 inches in diameter and another 16 inches in diameter were each carrying a stream of the same petroleum product under a pressure, say of 1,000 pounds per square inch, the circumferential pressure against the walls of the 8-inch pipe would total 8,000 pounds, while against the 16-inch pipe, it would be 16,000 pounds. Consequently, the larger diameter pipe requires a heavier wall thickness to resist the same pressure.

In addition to the pressure or bursting load which the line pipe is primarily designed to withstand, it must simultaneously carry tension loads resulting from temperature changes. Moreover, it must be designed to withstand, in addition to the pressure load, the force of tension resulting when the line, in traversing marshy terrain, is suspended between points of anchorage or where it traverses a river bed and must resist the forces of current, velocity, shifting sands, and the like.

Pipelines naturally follow the contour of the terrain in which they are laid. Consequently, it is important to have storage tanks, pumps, and so-called gathering systems which carry petroleum from the well-head in the oil field to the larger pipes where the petroleum awaits transmission to the refinery, to aid in the transportation of products of the oil wells to their destination through the pipelines.

The foregoing facts of record lead naturally to the questions of law to be discussed, *infra*. The properties, characteristics, uses, and functions of tubing and line pipe as structural shapes have been explained in the record by petroleum engineers of obvious competence and ability, to which reference has been made, *supra*.

## THE QUESTIONS OF LAW

The first question which confronts us is whether such steel sections, designated as API tubing and API line pipe, designed to possess strength and tensility to withstand efficiently the forces and loads described above, are structural shapes within the intention of paragraph 312, *supra*.

The meaning of the words "structural shapes" has been the subject of extensive litigation not only in this court, but also in our appellate court. Nearly 40 years ago, our appellate court, in *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, reviewed the classification of certain channels, bars, grates, frames, plates, posts of steel, and head or endpieces of cast iron, which were designed to be assembled as parts of a mash filter used in a brewery. That merchandise was classified in paragraph 167 of the Tariff Act of 1913 as articles, not specially provided for, composed of iron or steel, manufactured in whole or in part. The importer, in that case, claimed that the channels of steel were provided for by name in paragraph 104 of said act and that the steel bars or grates were "structural shapes" within the scope of that paragraph, which, in substance, is the predecessor of paragraph 312, *supra*; secondly, that the cast-iron frames, cast-iron plates, cast-iron centerpieces, cast-iron heads or ends, and cast-iron posts were castings of iron which were provided for in paragraph 125 of the Tariff Act of 1913.

It is significant, as will be noted later, that those articles were not designed for use as parts of a building, but rather as parts of the manufacturing equipment of a brewery, and evidently intended to carry the forces and loads incidental to that equipment. In its opinion, the court observed that the filter, of which the articles were designed to be a part, was a large and ponderous affair "capable of sustaining very considerable weights and tensions." The court then stated:

* * * A filter of that size made up of such constituents is, in our opinion, a structure as that word is commonly understood and the channels and grates of steel especially formed and designed for use in its construction are "structural shapes" within the meaning of paragraph 104.

The court was clearly of the opinion that Congress did not intend to confine the materials provided for in said paragraph 104 to such as were used for buildings, ships, and similar erections. It was impressed with the fact that inasmuch as—

* * * the paragraph provides for many articles which may be and are used in the construction not only of ships and buildings, but also in the erecting of such well-recognized structures as bridges, wireless towers, trestles, water towers, derricks, dams, canal locks, and filtration plants, coupled with the fact that it enumerates car-truck channels, a class of materials not designed for use in ships or buildings, convinces us that Congress had in mind more than two kinds of structures when the provision was passed. [Italics added.]

Of importance to our discussion here is the further observation of the court, in the Simon case, that—

Although a structure has been defined to be a production composed of parts artificially joined together according to plan and designed to accomplish a definite purpose it may well be doubted whether that definition any longer precisely and truly describes a structure as the word is generally and customarily used. * * * But however that may be, certain it is that the expression "structural shapes" does import to people in general a capacity to sustain heavy weights or to resist great tension or both, and the things denominated in paragraph 104 convince us that such were the "structural shapes" which Congress intended to subject to the duty therein prescribed.

That the provision for structural shapes was not intended to be limited to iron or steel bars used in "a large and ponderous affair" was made clear by our appellate court in Judson Freight Forwarding Co. v. United States, 20 C. C. P. A. (Customs) 229, T. D. 46038, wherein it held that lengths of steel angles, 2 by 2 by ¾₆ inches, used in the construction of ceilings, walls, roof trusses, skylights, and elevator guides, were classifiable in paragraph 312 of the Tariff Act of 1922 (corresponding to paragraph 312 of the Tariff Act of 1930), for the reason that they were designed to withstand relatively heavy weights with a minimum use of material. In arriving at this conclusion, the court referred to legislative history indicating that such light shapes designed for use in agricultural implements, fences, and other articles requiring light sections were intended by Congress to be classified as "structural shapes."

While the courts have not attempted to give a precise definition of the term "structural shape," one thought which flows through various decisions on the subject commands consideration, namely, that the term connotes a fabricated steel or iron section designed to be used in a structure to withstand maximum forces or loads with a minimum use of material. Note Simon, Buhler and the Judson Freight cases, supra; United States v. Frank, 15 Ct. Cust. Appls. 97, T. D. 42184; United States v. Julius Blum & Co., Inc., 26 C. C. P. A. (Customs) 168, C. A. D. 12; The Frost Railway Supply Co. v. United States, 39 C. C. P. A. (Customs) 90, C. A. D. 469; and United States v. The

*Winkler-Koch Engineering Co.*, 41 C. C. P. A. (Customs) 121, C. A. D. 540.

An examination of the record leaves no room for doubt that the tubing and line pipe in controversy were designed to be used, and actually are used, in oil wells and pipelines under conditions requiring them to withstand maximum forces and loads with a minimum use of materials.

This brings us to the important consideration whether oil wells and pipelines with their appurtenances are "structures."

As indicated above, while the word "structures" includes buildings, bridges, and edifices, it is not limited to such erections. The *Judson* case, *supra*, cites and quotes from the Summary of Tariff Information, 1920, prepared by the Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives and the Finance Committee of the Senate, where, under the title "Description and uses," it was stated that structural shapes were of two general categories—heavy and light. The former are those used in bridges and buildings. The summary, as quoted by the court, states with respect to the other:

\* \* \* Light shapes are used in the manufacture of agricultural implements, bedsteads, fences, safes, automobiles, and other articles requiring light sections.

Upon the basis of this legislative history, the court, in reaching its conclusion, stated:

\* \* \* Accordingly, we are of opinion that the Congress did not intend to limit the term "structural shapes" to such shapes of iron and steel as were used only in large structures, but that it intended to include therein all structural shapes of iron or steel having the "capacity to sustain [relatively] heavy weights or to resist great tension or both," and designed for the utilization of such capacity, to be used as such shapes, and suitable for such use in buildings, bridges, ships, cars, etc., requiring either heavy or light sections, or both, and also in certain "other articles *requiring light sections*" only. \* \* \* [Italics quoted.]

In a more recent case—*United States* v. *The Winkler-Koch Engineering Co.*, *supra*, our appellate court gave a very comprehensive review of earlier cases upon the subject of structural shapes, and, in holding that oil-well casings were "structural shapes" within the meaning of said paragraph 312, cited the *Judson* case, *supra*, and noted that the broad concept which it had given therein to the term "structural shapes" was supported by the tariff information prepared for the use of Congress when it was drafting the Tariff Act of 1922. Implicit in the court's finding that oil-well casings were structural shapes is the presumption that the court regarded oil wells as "structures," since it held that the function of casings was to sustain the forces and loads to which such wells were subjected.

While many of the decisions of our courts have described structural

shapes as load or force bearing members of a "structure," the latter word appears not to have been separately considered as such. It seems appropriate, therefore, to consider what interpretation other courts—Federal and State—have placed upon the word "structure," in construing other statutes.

Careful research discloses that, in general, a structure has been defined as something that has been built or constructed;[1] something composed of parts or portions that have been put together with human exertion.[2] There are variations to the general rule which are dictated by the context wherein the word is found and affected by the application of the rule of *ejusdem generis*.[3] Specifically, a "structure" has been held to include an improved highway under a law requiring public legal bodies to bond a contractor erecting a "public building or other structure."[4] An iron tank was held to be a structure under a law prescribing safeguards for labor employed to erect or maintain a house, building, or other structure.[5] The same rule was applied to locomotives.[6] It is interesting to note that, in holding an oil well to be within the scope of the term, the appellate court of Indiana stated:[7]

* * * In *McElwaine* v. *Hosey*, 135 Ind. 481, 492, 35 N. E. 272, it was said that the boiler, engine, shafting, beam, derrick, reel, ropes, and drill, when put in place and action, in drilling a gas well, constitute, not a mill, but a structure, within the meaning of the statute above mentioned. If such appliances for making a gas well be a structure, it would seem that a *completed oil well*, with all its appliances, including the drilled hole in the earth, *with its tubing*, should also be regarded as within the meaning to which the language of the statute may legitimately be expanded in its application by the courts. [Italics supplied.]

In statutes requiring protection to workmen employed in buildings or other "structures," the term has been extended to powerlines;[8] railroad tracks;[9] a concrete sewer;[10] and a subway.[11]

Of interest, by reason of its likeness to a pipeline, is the ruling that an underground concrete duct encasing electric conduits is a structure.[12] A structure may be below the surface of the ground as well as above it.[13]

---

[1] *Jefferson Davis County* v. *Riley*, 130 S. 283, 285.

[2] *Barr Lumber Co.* v. *Perkins* (Calif.), 295 Pac. 552, 555.

[3] *Healy* v. *Toles*, 254 N. W. 213, 214.

[4] *State* v. *Coda*, 138 S. E. 324, 328.

[5] *Standard Boiler* v. *McWeeny*, 218 Fed. 361, 363. (CCA 6th Cir.)

[6] *Loesch* v. *Long Island*, 151 N. Y. S. 499, 501.

[7] *Haskell* v. *Gallagher*, 50 N. E. 485. (Note)—The statute referred to authorized a mechanic's lien for labor or material furnished in the erection or repair of "any house, mill, manufactory or other building, bridge, reservoir, system of water works, or other structure * * *."

[8] *Western Electric Co., Inc.* v. *Cooley*, 251 Pac. 331, 333.

[9] *N. Y., N. H. & H. R. R.* v. *City*, 39 At. 597, 599.

[10] *Armenti* v. *Brooklyn Union Gas Co.*, 142 N. Y. S. 420, 425.

[11] *Muench* v. *Steel & Masonry Contracting Co.*, 140 N. Y. S. 330, 331.

[12] *El Paso Electric Co.* v. *Safeway*, 257 S. W. 2d, 502, 506.

[13] *Dysart* v. *Youngblood*, 102 Pac. (2d) 664, 665, 666.

The foregoing authorities disclose a striking similarity of views between the decisions of our customs courts in defining "structural shapes" to include "parts or members of a wide variety of structures" and the decisions of courts in other jurisdictions where the latter term has been specifically considered.

While the *Winkler* case, *supra*, does not directly hold that an oil well is a structure, such fact is implicit in the ruling that oil-well casings are structural shapes. That ruling was based upon evidence that in their normal use in an oil well, casings were subjected to forces and loads of tension, collapse, and burst, and that they were efficiently designed to withstand such forces to the maximum degree with a minimum use of material. The tension load was caused by the weight of the string of casings suspended from the wellhead, the collapse force was exerted by hydrostatic pressure from outside the well, and the burst force by the weight of the column of mud contained within the casing. See also *Humble Oil & Refining Co.* v. *United States*, 32 Cust. Ct. 32, C. D. 1577.

It appears from the record that tubing is subjected to the same forces and loads from similar sources. Tubing carries a tension load, because it is suspended from the wellhead in much the same manner as casing. It is manufactured from steel of known grades, including "upset" joints to insure the necessary tensile strength at the point of coupling. The column of mud found in the annular space between the casing and tubing exerts a collapse load on the walls of the tubing similar to the collapse force carried by the casing. A burst load is carried by the tubing when it contains petroleum within its walls under the tremendous force that is often generated by the gases in the subterranean deposits.

The record also discloses that the cylindrical shape of tubing is the most efficient design to enable it to resist, to a maximum degree and with a minimum use of material, the force of burst and collapse above described, since it is the characteristic of such hydrostatic forces that they are exerted equally in all lateral directions.

We are of the opinion, therefore, that tubing is an integral part of the structure of an oil well, carrying the forces and loads above described, and especially designed to carry such forces to the maximum degree, with a minimum use of steel. Consequently, the subject tubing responds to the definition of "structural shapes," as that term is used in paragraph 312, *supra*.

It is clearly shown by the record that a pipeline is an integrated structure consisting of pumping stations, storage tanks, connecting lines, and a maze of electrical equipment, all of which are designed to function as a unified system in the large scale storage and transportation of petroleum and its products.

By means of a motion-picture film (exhibit 7) the court was afforded an opportunity to observe the process by which a pipeline was constructed and placed in operation.

Statistical information[14] discloses that, in the United States, a vast network of more than 170,000 miles of pipelines carries petroleum and its products in tremendous quantities. As indicated earlier in this opinion, these pipelines are constructed so skillfully that it is possible to transport several different petroleum products, in sequence, to different destinations where they arrive on schedule with virtually no commingling of products. It may well be said that pipelines are structures of much greater complexity than the powerlines, concrete conduits, and railroad tracks that have been cited above. They are structures, because they are integrated systems of pipes, power stations, and terminal facilities designed to transport petroleum and its products to points of destination throughout the country.

It may be added that pipelines deliver their contents by maintaining pressure within the walls of the pipe ranging in magnitude from 800 pounds to 1,500 pounds per square inch. The line pipe in controversy is especially designed to carry this pressure load. Accordingly, it is manufactured in a variety of wall thicknesses and dimensions which enable the selection of grades and sizes that will carry the maximum anticipated loads with the minimum use of material.

It is our opinion, therefore, that line pipe, which is the load carrying member of the pipeline structure, is within the judicial understanding of the term "structural shapes," as used in paragraph 312, *supra*.

Since we have arrived at the conclusion that both the API tubing and the API line pipe, here under consideration, are structural shapes, within the contemplation of said paragraph 312, there still remains for determination the proper rates of duty applicable to that merchandise.

All of the tubing and one size of line pipe (2½″ in diameter) have been machined by a threading operation after being manufactured and are, therefore, dutiable as structural shapes, machined, at 7½ per centum ad valorem.

The other sizes of line pipe, illustrated by exhibit 8, are classified by API standards as "plain end pipe." It is disclosed by the record that this is a seamless pipe made from cylindrical, solid steel shapes known as "tube rounds." The steel is pierced and rolled in a series of successive operations until the desired diameter and wall thicknesses are obtained. The pipes are then straightened, cooled, and inspected. As a result of these operations, the ends of the pipe are irregular, and, in such condition, the pipe is unmerchantable. Consequently, these

[14] Bulletin 556, Bureau of Mines, U. S. Department of the Interior, entitled "Mineral Facts and Problems," page 617.

uneven ends must be removed to give the finished material the properties and proportions of pipe. This is accomplished in a single operation by a device holding three cutting tools that work simultaneously to cut the ends clean.

It appears, further, that the pipe can be used more efficiently in welding, if its ends are cut at an angle, and the cutting tools are adjusted to produce this result.

It is urged by the plaintiffs that the cutting operation is necessary to bring the steel into the shape and status of pipe; that it does not *advance* the condition of the pipe, because, until it takes place, the steel member has not acquired the status of a pipe dedicated for use as a structural shape.

Further, plaintiffs contend that if the cutting operation incidental to the finishing of rolled pipe were to be regarded as an advance beyond hammering, rolling, or casting, within the purview of paragraph 312, then, the higher rate would apply to all structural shapes with finished ends that had been hammered, rolled, or cast, and that this would deny application of the lower rate of duty provided in the paragraph to all rolled plain end pipes.

It will be recalled that defendant's witness, Siegle, admitted unqualifiedly that before the cutting operation was performed the pipe was not merchantable, usable, or salable. We are of the opinion that merely cutting the rough ends of the pipe to remove irregularities, which naturally result from the piercing and rolling operation, is not machining within the meaning of paragraph 312, and this is so regardless of whether the knives are set at an angle which produces a beveled edge, or are so set as to make a square end.

In *United Supply & Mfg. Co., The Crispin Company* v. *United States,* 37 Cust. Ct. 95, C. D. 1804, we held that seamless oil-well casing, which had been machined by the threading operation, was dutiable in paragraph 312 as structural shapes advanced beyond hammering, rolling, or casting, while casing, which had not been threaded for coupling, was held dutiable in the same paragraph as structural shapes, not advanced.

If, therefore, seamless steel casing with plain ends is not machined or advanced, it logically follows that plain end API line pipe is not advanced beyond hammering, rolling, or casting.

A somewhat analogous legal problem was presented in *Carr* v. *United States*, 11 Ct. Cust. Appls. 35, T. D. 38647. It was there held that matched flooring which had, in the process of manufacture, been incidentally bored as a guide for the nails, to lessen the danger of splitting the flooring when laid, was not "further manufactured than sawed, planed, and tongued and grooved," within the meaning of that language in paragraph 647 of the Tariff Act of 1913.

The boards were serviceable and useful without being bored, but were made more serviceable by that operation. However, that did not advance the boards beyond the condition of sawed, planed, and tongued and grooved. On the other hand, the material at bar did not become serviceable or useful as pipe until the dented and irregular ends were cut off.

We, accordingly, find and hold that all of the steel products in controversy are "structural shapes" within the spirit and intent of paragraph 312, *supra*, and are dutiable as follows—The tubing and one size of line pipe, 2½ inches in diameter, at 7½ per centum ad valorem, and all other sizes of line pipe at one-tenth of 1 cent per pound, as claimed by the importers.

This case was skillfully tried and excellent briefs have been filed, which have aided the court materially in its deliberations.

Upon the record, and for the reasons stated herein, the protests are sustained to the extent indicated, and judgment will issue in accordance with the views above expressed.