(C.D. 2608)

AMERICAN MANNEX CORP. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided January 4, 1966)

*Sharretts, Paley & Carter* (*Donald W. Paley* and *Gail T. Cumins* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before RAO, FORD, and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, consists of limited service steel casing with plain ends which are beveled but not threaded. It was assessed with duty at 7½ per centum ad valorem under paragraph 312 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as structural shapes, advanced beyond hammering, rolling, or casting. It is claimed to be dutiable under said paragraph at one-tenth of 1 cent per pound as structural shapes, not advanced beyond hammering, rolling, or casting.

The pertinent provisions of the tariff act, as modified, *supra*, are as follows:

[Par. 312, as modified, *supra.*]  Beams, girders, joists, angles, channels, car-truck channels, tees, columns and posts, or parts or sections of columns and posts, and deck and bulb beams, together with all other structural shapes of iron or steel:

    Not assembled, manufactured or advanced be-
        yond hammering, rolling, or casting_____. 0.1¢ per lb.
    Machined, drilled, punched, assembled, fitted,
        fabricated for use, or otherwise advanced be-
        yond hammering, rolling, or casting_____. 7½% ad val.

At the trial, there was received in evidence a sample illustrative of the casing which was imported in these shipments (except as to length), having one end beveled.  (Plaintiff's illustrative exhibit 1.) Dr. Gerhard Wagner, president of Mannesmann Tube Co., the manufacturer of the merchandise, and also of American Mannex Corp., the importer, and of Mannesmann International Corp., testified that he has a degree of master of mechanical engineering and a doctor's degree of engineering and has engaged in engineering pursuits since receiving them.  The plant in Canada at which the imported merchandise was produced was built under his direction, and he visited it frequently thereafter.  He described the process of manufacture as follows:

This is seamless pipe produced from solid steel billets called tube rounds.  They are first rolled on the so-called Mannesmann piercer, that makes it a rather thick wall, hollow.  Then, it is elongated on two different types of rolling processes and becomes a tube usually in in the lengths of from 30 to 40 feet, various diameters.  We can roll it from 10½ to 4¾ inches in this particular mill.  Then, it is a finished tube with both ends irregular and jagged, the front part not quite as badly as the lower part.  I think we have a front part here which can be seen in that part, the both ends of the pipe have to be cut off and they are being cut off in a so-called cut-off machine. * * * The cut-off is performed either way, with one tool or with several tools.  We happen to use the method of several tools because it is more efficient, it goes faster and that is what ultimately you aimed for in the plant to get higher production.

There was then received into evidence a piece of tube which had been partly cut off to illustrate the process.  (Plaintiff's exhibit 2.) That piece was cut by a single tool, but the witness testified that it would not look any different if done by a multiple number of tools. The tool by which it was cut was also received in evidence.  (Plaintiff's exhibit 3.)  Two photographs of the tools used to cut the imported merchandise were received in evidence as plaintiff's collective exhibit 4.  They illustrate two cutting heads, each with a tool attached,

cutting a pipe end. The two cutting heads are at the relative positions of 12 o'clock and 3 o'clock, and both cut the pipe as it revolves. One tool makes a straight cut which is necessary to remove the jagged ends, and the other bevels the edge. Both processes go on at the same time, but one tool cuts a section first and the other tool cuts the same section a little later.

According to the witness, when the pipe is produced, it has jagged irregular ends and, as it cannot be shipped or used that way, the ends have to be cut. Furthermore, the ends are irregular in thickness and have to be cut off at the point where the pipe is of even thickness. The casing pipe which is produced for oil companies has to be threaded and provided with couplings. Beveled ends are cut because the threading machine will receive the pipe more easily when there is a taper on it than when it has a plain cut. The witness explained:

* * * It is merely a cutting off proposition. It is not an advancement in how should I say, in manufacture. It is merely cutting off the end and we happen to like to cut it off on an angle and on a bevel as I explained because that is a better way for the pipe to be received by the threading machine.

After the pipe is threaded, the end is practically cut away. The beveled end serves no useful purpose in the finished threaded casing.

The witness said that the same result could be produced by using a single tool, such as exhibit 3. That type of tool may be used for a special job or when other tools are not handy. It is not actually used in the witness' plant because the separate tools permit a higher cutting speed and higher production.

It has been held that seamless hot-rolled API casings and limited service casings are structural shapes. *United States* v. *The Winkler-Koch Engineering Co.*, 41 CCPA 121, C.A.D. 540; *Humble Oil & Refining Co. et al.* v. *United States*, 32 Cust. Ct. 32, C.D. 1577; *United Supply & Mfg. Co., The Crispin Company* v. *United States*, 37 Cust. Ct. 95, C.D. 1804. When such casing had the ends threaded and were prepared for being screwed together or joined by coupling or were screwed and socketed, it was held dutiable as structural shapes, advanced by machining and fabricated for use or advanced beyond hammering, rolling, or casting. When it was not screwed and socketed nor threaded at the ends, it was held dutiable as structural shapes, not advanced beyond hammering, rolling, or casting.

The only question in the instant case is whether a casing with beveled ends has been advanced beyond hammering, rolling, or casting. Plaintiff claims it has not on the ground that, in order for the casing to acquire the status of structural shapes, the jagged ends had to be cut off and that no step in the creation of an article can be an advancement. Defendant contends that, whether or not the cutting

and beveling operations were simultaneous, the beveling operation was performed for a specific purpose and was an advancement.

An issue similar to that involved herein was before this court in *Humble Oil & Refining Co. et al.* v. *United States*, 40 Cust. Ct. 330, C.D. 2003, reversed on other grounds in *United States* v. *Humble Oil & Refining Co. et al.*, 46 CCPA 138, C.A.D. 717. One of the articles there was seamless line pipe made by rolling from cylindrical, solid steel shapes, known as "tube rounds." As a result of that operation, the ends of the pipe were irregular and the pipe was unmerchantable. Therefore, the uneven ends had to be removed. This was done in a single operation by a device holding three cutting tools which were adjusted so that the ends were cut at an angle. This court held that the articles were not advanced beyond hammering, rolling, or casting, stating (p. 344):

> It is urged by the plaintiffs that the cutting operation is necessary to bring the steel into the shape and status of pipe; that it does not *advance* the condition of that pipe, because, until it takes place, the steel member has not acquired the status of a pipe dedicated for use as a structural shape.

> Further, plaintiffs contend that if the cutting operation incidental to the finishing of rolled pipe were to be regarded as an advance beyond hammering, rolling, or casting, within the purview of paragraph 312, then, the higher rate would apply to all structural shapes with finished ends that had been hammered, rolled, or cast, and that this would deny application of the lower rate of duty provided in the paragraph to all rolled plain end pipes.

> It will be recalled that defendant's witness, Siegle, admitted unqualifiedly that before the cutting operation was performed the pipe was not merchantable, usable, or salable. We are of the opinion that merely cutting the rough ends of the pipe to remove irregularities, which naturally result from the piercing and rolling operation, is not machining within the meaning of paragraph 312, and this is so regardless of whether the knives are set at an angle which produces a beveled edge, or are so set as to make a square end.

This decision was reversed on the ground that sections of line pipe were not structural shapes since they did not serve to strengthen or support any other element. The meaning of the term "advanced" in paragraph 312 was, therefore, not discussed.

In a later case, however, *United States* v. *Baron Tube Co. et al.*, 47 CCPA 69, C.A.D. 730, paragraph 312 was construed. The merchandise there consisted of tubes produced by rolling and welding. The lower court held that they did not acquire the essential characteristics of structural shapes until they had been welded and that they were classifiable as structural shapes, not advanced beyond hammering, rolling, or casting. *Baron Tube Co. et al.* v. *United States*, 42 Cust. Ct. 10, C.D. 2059. The court of appeals reversed on the ground

that paragraph 312 did not cover articles which were not structural shapes until they had been processed beyond rolling, hammering, or casting. The court stated (p. 72):

As distinguished from the tubes before the court in *Winkler-Koch*, the tubes here in issue are not structural shapes until processing beyond "rolling, hammering or casting" has been completed. We think Congress intended to limit paragraph 312, as modified, to structural shapes which are structural shapes produced by "rolling, hammering or casting." Unless such a literal interpretation is placed upon this language, the distinction therein between "advanced" and "not advanced" structural shapes becomes meaningless. Failure to so read this paragraph was the reason for the dilemma considered by the court below. No step required for the creation of a structural shape under paragraph 312 as modified can, at the same time, be an advancement of a structural shape under the same paragraph.

Tubes which when rolled, possessed the physical properties required to qualify them as structural shapes, were classified as structural shapes under paragraph 312 as modified in *Winkler-Koch*. As such shapes they could then be further advanced. This, however, is not the case here. Paragraph 312 as modified does not refer to welding. In view of the failure to mention welding it is not clear that Congress intended tubes to be included therein unless they possessed the properties of structural shapes when rolled, hammered or cast. In view of the clear *eo nomine* provision in paragraph 328, for such tubes, we think they were properly classified under this paragraph.

In the instant case, the imported merchandise was produced by rolling followed by cutting and beveling. Under the reasoning of the *Baron Tube Co.* case, it would appear that, if it was not a structural shape at the end of the rolling operation, as plaintiff argues, it could not be covered by paragraph 312. Hence, that argument is for plaintiff a boomerang. Contrariwise, the basis of the collector's decision, not challenged in the protest, must be that, at the end of the rolling operation, the article was a structural shape.

Paragraph 312, as enacted in 1930, had its counterpart, exact so far as material to the present litigation, in paragraph 312 of the 1922 act. The prior corresponding paragraph of the Tariff Act of 1913, paragraph 104, was different in not prescribing a lower rate for shapes, not manufactured, assembled, or advanced, etc. The Congress, in 1922, had before it information that the imports of structural shapes were under 1 percent of domestic production, which, in turn, was dominated by the United States Steel Corp. Tariff Information Surveys (1921, paragraph 104, Structural Shapes. The survey further stated (p. 9):

After leaving the rolling mills, shapes are cut to length, cooled, and straightened. They are then further developed at shops specially adapted for carrying out the character of the work for which they

are intended—products designed for building construction being further fabricated in architectural iron works; bridge forms, in bridge works; ship material, in shipyards; and railroad products, in car shops.

From this and from the obvious intent to protect the user of steel more than the producer of steel *per se*, the reason for the wide difference in duties on unadvanced and on advanced shapes becomes clear. Rolling, hammering, and casting were functions of the steel mill and so were cutting to length, cooling, and straightening. It would seem, therefore, that the Congress could not have thought of cutting to length, cooling, and straightening, as advancement beyond rolling, hammering, and casting; otherwise, it would frustrate the distinction it was itself making. According to Summaries of Tariff Information (1948), schedule 3, part 2, page 73, more than three-fourths of the output of shapes was "fabricated, that is, machined, drilled, punched, etc., in mills before being shipped to construction enterprises." This, if accurate, would reflect a change in trade practices since 1921. In the instant case, the Canadian producer apparently acquired solid steel billets which it rolled on the "Mannesmann piercer," thus performing part of the operations normally attributable to an integrated steel mill. Assuming the 1948 practices prevail today, steel mills now more often than not process their structural shapes into the "fabricated" stage, but still the meaning of "not advanced" and "fabricated" reflected in 1921 a division of function between two segments of industry, which must be postulated in deciding what the terms mean today.

Judge Lawrence's decision in the *Humble* case, *supra*, would be *stare decisis* if it stands unaffected by the two later decisions of our appellate court. First, is the reversal of that very decision, which did not consider or disaffirm the holding here involved. Second, is the *Baron Tube Co.* case, *supra*. However, it will be noted that Judge Lawrence refers to plaintiff's boomerang argument about the casing not being a casing when the rolling but not the cutting is done, but does not adopt it as his own. His own argument rather looks at the "advanced" shapes and shows the operations performed on them, which the Congress intended to cover with added protection. The legislative history seems to support his view, and it is not inconsistent with *Baron Tube Co.* It follows that certain manipulations after rolling, incident to making the rolled shape merchantable and fit for shipment, do not constitute "advance" within the congressional intent. Cutting to length is one of these.

The cutting operation here involved is not exactly "cutting to length." We deduce from the court papers that customers are not interested in the exact length of each unit of the merchandise, only

average lengths. Typical invoices state outside diameter, weight per foot of length, and *average* length. Parts are cut off because they are excrescences, not to make the casings of any uniform length. Because the ends are irregular in thickness, they are unusable back to the point where the thickness is uniform. The witness said the jagged ends could not be shipped. He did not say why, but it would obviously be wasteful to ship steel that could only be discarded by the receiver.

In some cases, it has been held that cutting to lengths required for further manufacture is some kind of an advance. *Atkins, Kroll & Co.* v. *United States*, 50 CCPA 62, C.A.D. 821; *Chas. H. Demarest, Inc.* v. *United States*, 44 CCPA 133, C.A.D. 650. But these involve free list provisions for woody substances or grass, rough, or not manufactured. We have held that cutting of a reed into lengths did not take it out of the category of "woods—rough" when the cutting was done to get rid of excrescences, not to obtain the lengths required for further manufacture. *Rico Products Co. et al.* v. *United States*, 44 Cust. Ct. 100, C.D. 2159. While that case offers some parallels to the situation here, in that here, too, the object of the cutting is primarily to get rid of useless excrescences, we think that decisions interpreting different language in different contexts are not helpful guides: by going that far afield one could find authority for any proposition. Here, the Congress intended that the low specific duty should apply to shapes cut to length after rolling and that intent we believe applies *a fortiori* to shapes cut to remove excrescences without particular regard to length.

We reaffirm Judge Lawrence's view that it makes no difference whether the cut is square or beveled. Counsel spent a lot of time on whether the two cutting tools used made separately a square cut and a bevel and whether one followed the other rather than operating simultaneously. The evidence showed that identical work could have been done with a single cutting tool and doubtless it would have been if the importer had anticipated the cosmic significance attached to the double tooling. Merchandise is dutiable in its condition as imported. Customs officers should be able to classify imports by what they see before them. It is not desirable and is contrary to the general rule that two identical imports should have to be classified differently because of minor differences in the operations that produced them. Congressional policy may at times override the convenience of customs officers, but we should not multiply the instances to serve no discernible policy. Therefore, we hold that cutting a rolled steel oil well casing to remove excrescent ends is not "advance" beyond rolling either because the cut is beveled, not square, or because it is made with two cutting tools, not one.

We hold, therefore, that the merchandise involved herein is properly dutiable as structural shapes, not advanced beyond hammering, roll-

ing, or casting, at one-tenth of 1 cent per pound under paragraph 312 of the Tariff Act of 1930, as modified. The protests are sustained and judgment will be rendered for the plaintiff.